ALICE HUSAK, APPELLEE, V. THE OMAHA NATIONAL BANK, TRUSTEE, ET AL., APPELLEES, IMPLEADED WITH CLAY THOMAS, APPELLANT.

86 N. W. 2d 604

Filed December 6, 1957. No. 34208.

*Cassem, Tierney, Adams, Kennedy & Henatsch,* for appellant.

*Young, Holm & Miller* and *Edmund D. McEachen,* for appellee Husak.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action at law brought by Alice Husak, plaintiff, in the district court for Douglas County, originally against The Omaha National Bank, trustee, Richard K. Wilcox, Franklin K. Wilcox, and Clay Thomas, defendants. All of the defendants except Clay Thomas were dismissed insofar as this action is concerned. The purpose of the action was to recover damages for personal

injuries, pain, suffering, and expenses sustained by the plaintiff as the result of being struck by a crowbar dropped from the Keeline Building in Omaha by an employee employed by the defendant Clay Thomas, the exclusive manager of the building. The case was tried to a jury resulting in a verdict in favor of the plaintiff and against the defendant Clay Thomas in the amount of $9,000. The defendant Clay Thomas filed a motion for a new trial which was overruled. From the order overruling the motion for new trial, said defendant appeals.

For convenience we will refer to the parties as originally designated in the district court, that is, Alice Husak as plaintiff, and Clay Thomas as defendant.

The record discloses that the defendant, Clay Thomas, had exclusive authority in the management of the Keeline Building and had managed the building for 40 years. He had the exclusive authority to hire and fire employees, and gave employees directions as to their duties. He had direct and exclusive responsibility for the upkeep of the building, its maintenance, the collection of rentals, and the payment of taxes and all other matters connected with the building. He employed Andrew John Koziol as a janitor, and paid him for his services.

The witness Koziol testified that he was originally employed by the defendant 35 years ago as a janitor in the Keeline Building and was acting in that capacity on August 17, 1953. On that date he was working on the third floor of the building, repairing windows by the use of a crowbar which weighed $11\frac{3}{4}$ ounces. The crowbar slipped out of his hand, dropped to the second floor where it hit a ledge approximately 2 feet wide and 18 feet from the sidewalk, and then fell, striking the plaintiff.

The plaintiff testified that at the time of the accident, August 17, 1953, she was 52 years of age. She was employed by the Fred and Clark Haas Store as a cashier

and wrapper, and had been so employed for a period of 24 years. She testified that on August 17, 1953, she was walking north on the east side of Seventeenth Street between Harney and Farnam Streets. As she was passing the Keeline Building, she suddenly felt a terrific blow on her right shoulder, had an excruciating pain, and started sinking to the sidewalk. At that time a man in close proximity to her took hold of her and helped her into the Suris Flower Shop where they seated her. Shortly thereafter a man entered the shop and said in an excited tone of voice that he had dropped the crowbar. He was the janitor of the Keeline Building. She remained in the flower shop for a short period of time. Mrs. Suris called the building manager, the defendant. He inquired as to who the plaintiff's doctor was, and apparently called the doctor for her. Mrs. Suris also called her employer who sent a woman to assist her in getting to her doctor's office in the Aquila Court. Her doctor, Dr. John McGee, examined her and sent her to the Doctors Hospital where she remained for a period of 10 days. She further testified that when she arrived at the hospital she had pain; that she was unable to move her arm which felt numb as did her hand and fingers; and that her right shoulder began to swell and turn black and blue on the top of the shoulder, and it spread into her arm and covered the entire shoulder and shoulder blade. When she left the hospital she was unable to use her right arm. She could use her right hand, although she was not able to raise her arm. She had the use of the arm from the elbow to the hand. She stayed at home about 20 days. Her salary was $32.50 a week, making her loss of earnings amount to $130. When she returned to work she was unable to use her arm, but could use her hand. She could not raise her arm, due to the pain in her shoulder. She used heat therapy during the time she was home and after she went to work. At the hospital, for the first 2 days they used cold packs, and then heat. It was stipu-

lated that she purchased a heat lamp for $10, and used it. When she returned home she had difficulty in sleeping. She would wake up with pain in her shoulder. The shoulder seemed to improve a little and then in about 4 months it became worse. At that time the doctor prescribed cortisone for her. As to her employment, she testified that she was a cashier and wrapper. She handled "will-call" merchandise which is kept on hangers on rods. She was required to use a pole to take the garments off the rod. She was unable to do this work when she first returned, and had to have help. She could use her left hand and arm to some extent. She was in this condition for about a year and a half after the accident. Her work was very tiring, because of the manner in which she had to perform it. She saw Dr. McGee in his office several times during the fall of 1953 and the winter and spring of 1954. She also contacted Dr. Richard Smith, an orthopedic specialist, in July 1954. From the date of the accident to the date of her consultation with Dr. Smith, she was unable to raise her arm high enough to reach her head. The only way she could comb her hair was to lean her elbow on the dresser and bring her head down so that she could reach it. She had difficulty in doing the housework in her apartment during this period of time. She was unable to dress herself properly. She did exercises prescribed by Dr. Smith for a period of 2 years, which added somewhat to her improvement. At the age of 19, she had an attack of polio which affected her lower limbs in such a manner that she had to use the strength in her arms to arise from a sitting position. Due to the accident, this was a painful ordeal, as was the effort of ascending stairs. The court properly instructed that her previous condition should not be taken into consideration except as stated in instruction No. 9. No error exists with respect to this instruction, and none is claimed.

By deposition Robert Earl Swarm testified that he was in Omaha on August 17, 1953, in the vicinity of

the Keeline Building between 11 a.m. and 12 noon, when he saw a lady in distress. He had parked his car, and he got out and went to her assistance. He took her into a flower shop. This was the plaintiff. She seemed to be stunned, and apparently in a helpless condition.

Dr. J. W. McGee testified that he saw the plaintiff on August 17, 1953, and at that time the plaintiff had a severe right shoulder injury, and there was no question but that it was the result of a blow. There were bruises, swelling, and ecchymosis. The bruises and swelling covered the upper part of the plaintiff's right shoulder, that is, the top part and over the edge of the shoulder. She was X-rayed at Doctors Hospital and given sedatives and therapy of cold packs. There was no demonstrable fracture, dislocation, or bony change shown by the X-ray. She had sedatives while she was in the hospital. Her right arm was painful and she could not use it. She was in the hospital from August 17 to August 27, 1953, and saw the doctor in his office on October 21 and 26, 1953, and on February 8 and 19, and March 22, 1954, for treatment for her right arm and shoulder. He further testified that according to her history the pain was connected with the blow she had received when a crowbar was dropped in such a manner as to strike her right shoulder. Her last call at his office was May 24, 1954. He testified that in February 1954, she was put on cortone (cortisone) because he felt she might be developing peri-arthritis which is a condition of the soft parts about the joints and does not necessarily pertain to the bone. It is usually due to thickening and irritation of the muscles and ligaments in the area of the joint. He further testified that she always had pain in the movement of her arm.

Dr. Richard Smith, an orthopedic surgeon, was consulted by the plaintiff first on July 20, 1954. She gave him a history of being injured on August 17, 1953, when she was struck on the right shoulder by a crowbar. The

doctor testified that on July 20, 1954, the plaintiff had considerable tenderness about the right shoulder which was diffused, not well localized. There was crepitus or grating in the shoulder joint with motion. There was atrophy of a number of muscles about the shoulder, the supra and infra spinati, and the deltoid muscles. She had limitation of motion in the shoulder. Internal and external rotations were two-thirds normal. He testified that external rotation is putting the elbow at the side and then moving the hand from in front out to the side, and internal motion is the motion of putting the hand behind the back. She had internal rotation to the extent of reaching her lumbar spine area, compared to normal internal rotation which allows one to reach between the shoulder blades. She had flexion, the motion of lifting the arm straight in front, of approximately 90 degrees, compared to normal flexion of 180 degrees. She had abduction, the motion of lifting the arm upward from the side, of approximately 60 degrees, compared to normal abduction of 180 degrees. What shoulder action she had was primarily scapular, the arm and shoulder moving as if fused, rather than with normal glenohumeral rhythm in which the arm moves independently of the shoulder. The atrophy of muscles indicated she was using scapular muscles rather than the muscles normally used to raise the arm. He diagnosed the cause of limitation of motion in her shoulder as "adhesive capsulitis" which is adhesions of the soft tissue about the shoulder joint. These adhesions become quite solid and sometimes result in a completely "frozen shoulder." The condition was the result of trauma sustained in the accident of August 17, 1953. He prescribed a certain type of exercise, the length of time that the exercise should be done being 20 minutes two or three times a day, in order to endeavor to improve the plaintiff's condition. He explained the reasons therefor in his testimony. He last saw the plaintiff on December 31, 1956, shortly before trial and approxi-

mately 3 years and 4 months after the accident. He testified that at that time she still had limitation of internal rotation of approximately 10 degrees, and complained of the aching of the right shoulder, especially in cold weather. The court limited the questioning of the doctor to future pain and suffering only, excluding any evaluation of disability and permanent injury.

Dr. Werner P. Jensen testified in behalf of the defendant. He specializes in orthopedics. He examined the plaintiff on December 18, 1956, and found as a result of this examination that she had full range of motion of her shoulder. There was no atrophy in her shoulders or arm. She could abduct her arm out to the side, flex it, extend it, externally and internally rotate the right shoulder about the same as the left shoulder, and was able to put each of her hands up behind her back and between her shoulder blades. Upon testing the muscle strength of her upper extremities he found that she had good bicep and tricep strength and good strength on abducting her arm. In checking the sensation of her upper extremities, there was no alteration of the normal pattern of sensation, suggesting that the nerves were essentially normal. The reflexes of her upper extremities were normal. On examining her shoulder, she did not complain of any tenderness when he pressed on the joint between her shoulder blade and collar bone, around the upper end of the humerus, or around her shoulder blade.

The hospital and doctor bills were stipulated.

The defendant assigns as error the following: (1) The court erred in failing to find that the verdict of the jury was excessive and the result of passion and prejudice, and in overruling defendant's motion for new trial. (2) The court erred in its instruction No. 8 in allowing the jury to assess damages for future pain when the plaintiff's petition failed to allege future pain or permanent injuries and when the evidence on the subject was vague and uncertain. (3) The court erred

in allowing the plaintiff's physician to testify, over defendant's objection, as to future pain that plaintiff would suffer as the result of injuries received in this accident when plaintiff in her petition failed to allege, among other specified damages, future pain or permanent injuries resulting from said accident.

We discuss the assignments of error in continuity.

In Remmenga v. Selk, 152 Neb. 625, 42 N. W. 2d 186, we said: "A verdict may be set aside as excessive only when it is so clearly exorbitant as to indicate that it was the result of passion, prejudice, or mistake, or that it is clear that the jury disregarded the evidence or controlling rules of law." See, also, Fridley v. Brush, 161 Neb. 318, 73 N. W. 2d 376.

"The law gives to the jury the right to determine the amount of recovery in cases of personal injury. That is, of course, one of its functions, and, if the verdict is not so disproportionate to the injury as to disclose prejudice and passion, it will not be disturbed." Dailey v. Sovereign Camp, W. O. W., 106 Neb. 767, 184 N. W. 920. See, also, Fridley v. Brush, *supra*.

In Sutton v. Inland Const. Co., 144 Neb. 721, 14 N. W. 2d 387, we said: "No method of exact computation can be devised in determining compensatory damages in cases of this kind. We think the evidence was such that the jury could properly arrive at the amount determined upon by them. We can find no yardstick whereby we can say as a matter of law that the verdict was excessive. Under such circumstances this court may not substitute its judgment for that of the jury, even if it be assumed that this court would determine that a lesser amount would constitute adequate compensation for the injuries sustained." See, also, Peacock v. J. L. Brandeis & Sons, 157 Neb. 514, 60 N. W. 2d 643; Paddack v. Patrick, 163 Neb. 355; 79 N. W. 2d 701.

This assignment of error cannot be sustained.

With reference to the admission of evidence as to future pain and suffering and the giving of instruction

No. 8 allowing recovery thereon, the defendant contends that in the absence of an allegation of future pain and suffering the submission of this issue was prejudicially erroneous. This court is committed to the rule that damages for future pain and permanent effect of injuries proximately caused by a tort are recoverable under the general ad damnum clause and need not be specifically alleged.

In the case of City of Harvard v. Stiles, 54 Neb. 26, 74 N. W. 399, it was held: "A recovery may be had under a general allegation of damages for all injuries which necessarily follow as results of the act, the subject of complaint. They need not be specially pleaded, and this is applicable to necessarily resulting permanent effects of the injuries." As previously stated, permanent disability was not submitted to the jury in the instant case. The court went on to say: "Under the general allegation of damages in a petition, the plaintiff may recover for all the injuries which necessarily resulted from the act complained of, and it is needless to specify them. So damages for the future and permanent effect of injuries, necessarily resulting to the plaintiff, are recoverable under the general ad damnum clause and need not be specifically alleged. (5 Ency. Pl. & Pr. pp. 748, 749, and cases cited; Bank of Commerce v. Goos, 39 Neb. 437.)"

In Jacobsen v. Poland, 163 Neb. 590, 80 N. W. 2d 891, it was said: "In an action for personal injury plaintiff may recover all the damages proximately caused by the tort under a general allegation of the whole amount of the damages caused, including any damages for impairment of his capacity to earn money. Nye v. Adamson, 130 Neb. 887, 266 N. W. 767; Carlile v. Bentley, 81 Neb. 715, 116 N. W. 772." See, also, 15 Am. Jur., Damages, § 314, p. 756.

The petition in the instant case sufficiently alleged the subject matter instructed upon by the court as to future pain and suffering with reasonable certainty. It

is as follows: "As a proximate result of being struck by said crowbar, plaintiff suffered a severe bruise and contusion covering her entire right shoulder, causing her to suffer great pain and require hospitalization and medical treatment and submit to the necessity of medical attention for an unknown period of time in the future."

The defendant's second assignment of error is not sustained.

With reference to the third assignment of error concerning future pain and suffering, the defendant refers to a part of the testimony of Dr. Smith wherein he testified: "Yes, I think she will have pain in her shoulder; as I stated before with cold weather, especially, and damp weather she will have pain, intermittently, not constant." The doctor's answer related to pain the plaintiff might suffer in the future by virtue of her injury. The defendant objected only on the ground that the question was based on the fact that future pain and suffering had not been alleged, and that such pleading was necessary to such proof. The defendant also, in support of the claim that future pain was not proved with reasonable certainty, makes reference to the life expectancy tables which were not introduced in evidence.

"The law does not require the production of tables of expectancy in order to prove the probable duration of human life. Such evidence, if tendered, is not conclusive, but may be received and considered with other evidence in the case bearing upon the question of the probable continuance of life of the injured person." Moses v. Mathews, 95 Neb. 672, 146 N. W. 920, Ann. Cas. 1915A 698. See, also, Litwiller v. Graff, 124 Neb. 460, 246 N. W. 922.

As stated in 20 Am. Jur., Evidence, § 1215, p. 1066: "In proving life expectancy, standard mortality tables are universally accepted as competent proof. The law does not, however, require the production of such tables

whenever there is an issue of expectancy of life, and does not regard them as essential to the establishment of that issue or to the recovery of damages on account thereof."

We find no prejudicial error as contended for by the defendant.

For the reasons given in this opinion, the judgment of the trial court should be, and is hereby, affirmed.

AFFIRMED.