NATKIN & COMPANY, plaintiff, v. R. F. BALL CONSTRUCTION COM-
PANY, INC., et al., MASON CITY BRICK AND TILE COMPANY,
defendant, cross-petitioner and appellee; JACOB LICH-
TER and JENNIE L. LICHTER, d/b/a SOUTHERN FIRE-
PROOFING COMPANY, a partnership, intervenors,
additional defendants to cross-petition,
appellants.

No. 50913.

(Reported in 123 N.W.2d 415)

SEPTEMBER 17, 1963.

REHEARING DENIED JANUARY 14, 1964.

Shuttleworth & Ingersoll, of Cedar Rapids, and Steer, Strauss & Adair, of Cincinnati, Ohio, for intervenors, additional defendants to cross-petition and appellants.

Beck & Butler, of Mason City, for defendant, cross-petitioner, and appellee.

STUART, J.—This appeal involves a dispute between a defendant and an intervenor in an action brought in equity under the provisions of chapter 573, Code of Iowa, relating to claims for labor and materials on public improvements. All other claims involved in the action have been resolved. Mason City Brick and Tile Company, hereinafter referred to as Mason City, filed a claim with the Cedar Rapids Independent School District for the price of the last carload of bricks furnished Southern Fireproofing Company, a partnership, which was the masonry subcontractor on two school buildings in the district. Southern Fireproofing Company and the individual partners, hereinafter referred to as Southern, counterclaimed against Mason City for damages alleged to have been sustained because the bricks Mason City furnished did not meet the specifications as to length. The trial court held that under the specifications Mason City was required to furnish bricks only $11\frac{1}{2}''$ long rather than $11\frac{5}{8}''$ as claimed by Southern and even if they were to have been $11\frac{5}{8}''$ only 3 percent of the bricks furnished for one school were not within the $\frac{5}{16}''$ tolerance. The trial court also held Southern failed to properly prove its damages. Southern has appealed.

The trial court's finding that the bricks met the specifications of the contract can be upheld: (1) if the specifications called for $11\frac{1}{2}''$ brick rather than $11\frac{5}{8}''$ brick, (this involves an interpretation of the specifications) or (2) if the tolerance of $\frac{5}{16}''$ applies to the average of all bricks furnished. Southern contends each brick could be either $\frac{5}{16}''$ longer or shorter than the specified length, but all bricks should average the specified length. Mason City argues every brick could be $\frac{5}{16}''$ shorter than the specified length and still be within the tolerance.

As the facts on these two propositions are not related they will be set out separately.

I. The typewritten specifications for the construction of the school buildings dated July 11, 1955, provided as follows:

"4-06. FACE BRICK shall meet the requirements of A.S.T.M.

Spec. C-216-50. Grade SW, Type FBS. All face brick shall be 'norman' size (2½″ x 3½″ x 11⅝″). Face brick for the George Washington School shall be 'Norman Rose Velour' face brick, manufactured by the Endicott Clay Products Company, Fairbury, Nebraska.

"Face brick for the Thomas Jefferson School shall be 'Norman Dark Blend Velour' face brick manufactured by the Endicott Clay Products Company, Fairbury, Nebraska."

On August 1, 1955, the specifications were amended in the following respects:

"a. Paragraph 4-06, size of Norman Brick shall be 2¼″ x 3½″ x 11⅝″ instead of 2½″ x 3½″ x 11⅝″ as specified." (Emphasis supplied.)

The evidence is clear that "Norman size brick" manufactured by Endicott Clay Products Company of Fairbury Nebraska is 2¼″ x 3½″ x 11½″. This is shown by the price list, testimony of Endicott's officers and correspondence between Mason City and Southern. It is also clear Endicott could easily have made brick 11⅝″ long but that the brick for this job had been run prior to the time complaint was made about the short brick. It is equally clear Southern expected brick 11⅝″ long and contemplated either an adjustment in the price or a correction in the size. Mason City was firm and consistent in its position that the brick delivered met the specifications.

The trial court held the typewritten specifications "Norman size (2¼″ x 3½″ x 11⅝″)" created an ambiguity and applied the rule of law that words shall govern in the case of inconsistency between words and figures. 17 C. J. S. 730, Contracts, section 311, saying:

"In view of the fact that the samples submitted and approved were 11½ inches long, that the architects were familiar with the Endicott products, that the price list put out by Endicott discloses that the length of Norman face brick is 11½″, that the A.S.T.M. specifications provide that purchasers should ascertain the type and sizes of brick available in the locality under consideration, and the rule of law pertaining to interpretation of contracts, the Court is of the opinion and decides that

the specifications called for face brick 11½" in length. All brick furnished were within the permissible tolerance."

We find no evidence which would justify the inference that the architects approved brick 11½" long. They did not testify for either party and Mr. C. R. Pearson, plant manager for Mason City, over objection, stated only that the architects obtained 32 samples of each brick which they approved. Furthermore we are not concerned with the architects' knowledge but with the contract between Mason City and Southern in which bricks "norman size 2¼" x 3½" x 11⅝" " were specified. Southern did not see the Endicott price list, nor was it at anytime informed that the measurements of the brick listed in the specifications were incorrect. The architects who wrote the specifications were the ones familiar with the Endicott product and were the ones charged with the duty of investigating the size of the brick under the A.S.T.M. specifications referred to by the trial court. "Note 5" reads as follows:

"Note 5—Purchasers should ascertain the type and sizes of brick available in the locality under consideration and *should specify accordingly,* stating a size and type represented by the available brick. In general, brick having a wide range of colors will require greater tolerance for the full range of colors than for a restricted range of colors." (Emphasis supplied.)

Southern, bidding on the specifications which specified "norman size (2¼ x 3½ x 11⅝)" should be able to rely upon the architects specifications and not be required to check their accuracy as to size. This is particularly true since the architects found it necessary to correct one dimension in this very specification. The "2½" dimension in the original specifications was changed to "2¼" by amendment. This action would tend to assure the bidder of the importance and accuracy of the figures contrary to Mason City's claim that "norman size" designated the specific measurements.

In order for the rule relied upon by the trial court to apply to the instant case an inconsistency must exist between the words and figures. The most common and obvious inconsistency, of course, occurs in the situation where one number is written out and is followed by a different figure. There is

no question about the applicability of the rule in such case. Here there is no obvious ambiguity and if one exists it could only arise because "norman size" has a fixed and definite meaning in the trade as a brick 2¼" x 3½" x 11⅝".

There is not a great deal of evidence on this point. "Norman size" brick manufactured by Endicott is 11½" long, but Endicott could easily make brick 11⅝". It would be reasonable to assume they would adjust their molds to meet the length specification on an order of 600,000 to 650,000 bricks. The only evidence which even suggests that "norman size" means brick 2¼" x 3½" x 11½" is found in the following testimony of Mr. Pearson, plant manager for Mason City:

"Q. Are you familiar with the length of Endicott Norman Velour Brick throughout the period from 1954 to 1957?

"Mr. Steer: Objection for the same reason, Your Honor, that the specifications require a brick of a certain length, the end specification of which is 11⅝", and the fact that he is familiar with Norman size brick that has been sold on other occasions is of no relevancy at this time.

"A. Standard Manufacture of Endicott Norman brick is 11½", which is also in accordance with other industry size for Norman brick."

We do not believe this evidence is strong enough to place fixed and definite dimensions upon the brick size. This conclusion is supported by the testimony of Mr. Pearson who, after stating the brick called for in the specifications "must be Endicott Norman Brick as they produce it", continues:

"The size in the parenthesis as noted, to begin with was in error on one or two dimensions. Generally in a situation like this, it is simply to help recognize the size of the brick was not Norman size so that Norman size is more fully explained. Actually, that is not the correct description, the size description for a Norman brick given in this specification, it is an error by the architect. This was proper to describe masonry units and not their exact size. *In these specifications the proper description would have been 2⅔ x 4 x 12".*" (Emphasis supplied.)

His testimony indicates that norman size brick is the size which will create a masonry modular unit 2⅔" x 4" x 12",

rather than the specific dimensions of the brick to be used to construct such modular unit. The use of quotation marks around "norman size" suggests the architects were not sure of its meaning when they made up the specifications.

We hold the figures in the specifications set forth the dimensions of the brick to be furnished and that "norman size" does not define a conflicting set of dimensions which would call for the application of the rule that words prevail over figures when in conflict.

II. The second problem for determination is the application of the tolerance of $\frac{5}{16}''$ called for in the A.S.T.M. (American Society for Testing Materials) specifications. Southern applies the tolerance to the individual brick and not to the deviation of the average length of the brick from that specified. Mr. Lichter, a partner, describes Southern's position as follows:

"Tolerance has nothing to do with the average. The tolerance is the deviation permissible from the stated size by any individual brick, the deviation both over and under, but the size from which the deviation is to be permitted is the size on the specification and no other. When you take the totality of number of brick, you take the totality of the size, and when you get this total, divide by the number of brick and this must average almost exactly the size specified and this is always true. That is not the tolerance you are talking about, the tolerance is the deviation of each of the individual brick and has nothing to do with the deviation in tolerance permitted by the specification.

"Our counterclaim is based on the fact that the average size of the brick deviated and was not what was specified. It is not a question of tolerance we are talking about."

Mason City takes the position that every individual brick could be as much as $\frac{5}{16}''$ less than the specified length and still meet the specifications and that the average length was of no importance as long as it is within the $\frac{5}{16}''$ tolerance.

Both parties claim the A.S.T.M. specifications support their position. These must be interpreted and applied to the case at bar. The bricks specified for this job were: Grade SW Type FBS. The following excerpts are from the A.S.T.M. specifica-

tions: "Specifications for facing brick (C 216-50) * * * Size 8. (a) Size—The size of brick shall be as specified by the purchaser (see Notes 5 and 6). In a sample of ten brick selected to include the extreme range of color and size of brick to be supplied, no brick shall depart from the specified size by more than the individual tolerance for the type specified as prescribed in Table IV. * * *."

Table IV—Tolerance on dimensions for bricks 8 to 12 inches in length, type FBS, is $\frac{5}{16}''$.

"Sampling and Testing 10. (a) For purposes of tests, brick that are representative of the commercial product shall be selected by a competent person appointed by the purchaser, the place or places of selection to be designated when the purchase order is placed. The sample or samples shall include specimens representative of the complete range of colors and sizes of the brick supplied or to be supplied. The manufacturer or the seller shall furnish specimens for tests without charge.

"(b) The brick shall be sampled and tested in accordance with the Standard Methods of Sampling and Testing Brick (A.S.T.M. Designation: C 67)."

Standard Methods of Sampling and Testing Brick. A.S.T.M. Designation: C 67-50 referred to above provides:

"Scope 1. These methods cover procedures for the sampling and testing of brick for modulus of rupture (flexure test), compressive strength, absorption, saturation coefficient, effect of freezing and thawing, initial rate of absorption (suction), and efflorescence."

"Measurement of Size.

"Apparatus 36. Either a 1-ft. steel rule, graduated in $\frac{1}{32}$ in. divisions, or a brick gage or caliper having a scale ranging from 1 to 12 in., graduated in $\frac{1}{32}$-in. divisions, and having parallel jaws, shall be used for measuring the individual brick. Ten brick shall be averaged to determine the average measurement.

"Test Specimen 37. Ten dry full-size brick shall be measured. These brick shall be representative of the shipment and shall include the extremes of color range and size as determined

by visual inspection of the shipment. (The same samples may be used for determining efflorescence and other properties..)

"Individual Measurements of Length, Width, and Depth. 38. The length shall be measured along both beds and along both faces from the mid-points of the edges bounding the ends. These four measurements shall be recorded to the nearest $\frac{1}{32}$ in. and the average recorded to the nearest $\frac{1}{64}$ in. as the length. * * * Either the steel rule or the brick gage described in Section 36 may be used. Retests shall be made by the same method when required."

The application of the tolerance provision is important because an interpretation favorable to Mason City would leave Southern without a substantial claim as almost all of the bricks would then be within the tolerance.

The average length of the brick sampled on Thomas Jefferson School was $11.60\frac{5}{16}$ or $11.378''$. Three percent of the bricks were $11\frac{1}{4}''$ long; 22 percent were $11\frac{5}{16}''$; 46 percent were $11\frac{3}{8}''$; 27 percent were $11\frac{7}{16}''$; 1 percent were $11\frac{1}{2}''$; 1 percent were $11\frac{5}{8}''$.

Since we have held the specifications called for $11\frac{5}{8}''$ brick, three percent of the brick $(11\frac{1}{4})$ would not be within the specifications under the theory advanced by Mason City. The average length however was $.297''$ less than the specified length of $11\frac{5}{8}''$ or $11.625''$.

On the George Washington School the bricks average $11.489''$ or $.186''$ less than called for in the specifications. Ten percent of the bricks were $11\frac{3}{8}''$ long; 29 percent were $11\frac{7}{16}''$; 5 percent were $11\frac{5}{8}''$; 35 percent were $11\frac{1}{2}''$; 20 percent were $11\frac{9}{16}''$.

Under Mason City's theory all brick in the George Washington School would be within the tolerance even if required to be $11\frac{5}{8}''$ long.

The trial court accepted Mason City's position on tolerance and held that only three percent of the brick on the Thomas Jefferson School were not within the tolerance.

It is difficult for us to recognize any purpose in specifying brick of a particular size if every brick furnished could be $\frac{5}{16}''$ less than the specified length. If such a deviation from the

specifications were permitted, it would be impossible for any bidder to make an intelligent estimate of the construction cost. We recognize that bricks are not such an exact building material that the individual tolerance can be held within a narrow range, but there would seem to be no reason why the lengths could not be averaged out to come close to the specified length. While shortages of .297″ and .186″ may seem to be insignificant, this fraction of an inch is multiplied many hundreds of thousands of times in the construction of a large brick building. This is illustrated by the computation made by Southern in an effort to establish damages, which will be discussed in detail in the next division. Southern figured that if the width of the vertical joints were not adjusted to compensate for the short brick, 10,296 more bricks would have been needed on these two buildings because of the difference between the average length of the brick actually furnished and the specified length. Obviously, either additional brick or mortar would be needed to fill the void left by the short brick. Therefore the contractor must be assured of brick of the specified size on the average to make an accurate bid. It does not seem realistic to say that Mason City could furnish all short brick and leave the bidder in the uncertain position of making a bid when he could not estimate accurately how many bricks would be required.

We believe the A.S.T.M. Specifications for Facing Brick and the Standard Methods of Sampling and Testing support our conclusion.

Section 8(a) of the specifications for facing brick relates to size of brick. It states "The size of brick shall be as specified by the purchaser. In a sample of ten brick selected to include the extreme range of color and size of brick to be supplied, *no brick* shall depart from the specified size by more than the *individual tolerance* for the type specified * * *." (Emphasis supplied.) The purpose of this sampling seems to be to insure the purchaser that the individual brick are all within the tolerance. As there is a direct relationship between size and color, such a selection should reach the extremes of length. The tolerance is quite specifically limited to the individual brick.

There is nothing to even indicate that it is intended the average of all 10 bricks may vary $\frac{5}{16}''$ from the specifications.

The specifications also provide that the brick shall be sampled and tested in accordance with the Standard Methods of Sampling and Testing brick, which has specific instructions for determining measurements including the *averaging* of 10 sample bricks. Mason City argues this section does not apply to "measuring for size" as the scope paragraph refers only to testing for modulus of rupture, compressive strength, absorption, saturation coefficient, effect of freezing and thawing, initial rate of absorption and efflorescence. It claims the measurement for size relates only to the information necessary for the laboratory tests and not a sampling for size itself.

This argument seems to be answered by the fact that the specifications for face brick refers to these methods as the ones to be used. In addition it is obvious from an examination of the Standard Methods pamphlet that they do provide for tests beyond the scope section. The first several main headings have the same title as the items mentioned in the scope section i.e.: sampling, modulus of rupture, compressive strength, etc. However, the last two main headings are "Measurement of Size" and "Measurement of Warpage". The subheads under each of these sections correspond with the subheads under the other sections. While it may be argued the measurement of size section applies only to the foregoing headings listed in the scope section, it cannot be argued that "Measurement of Warpage" is anything but a separate test and has no connection with the laboratory tests. Since this test appears in the pamphlet without being included in the scope section, there is every reason to believe the "measurement of size" test is an independent test. Measurement of warpage appears in the Specifications for Facing Brick as section 8(b), the second subparagraph. Section 8(a) is the paragraph for measurement of size hereinabove referred to.

This interpretation leaves us without any stated tolerance as to the average deviation from the specifications. However no attempt is made in the specifications to cover all possible conflicts. For example, the variation of the width of the joints is left to custom of the trade. The variation from the average

could also be treated in this manner. This problem is not before us at the present time as there is no question but what the deviation from the average was substantial.

It is our opinion that the Specifications for Facing Brick and Standard Methods contemplate the use of an average in determining if the bricks meet the specifications and that the tolerance of $\frac{5}{16}''$ applies to the variation in the size of the individual bricks and not the deviation from the specifications.

██ III. The trial court also held that Southern did not offer proof of facts establishing a proper basis from which damages could be computed. There is a recognized distinction between proof of the fact that damages have been sustained and proof of the amount of those damages. One cannot recover if it is speculative and uncertain as to whether the damages claimed have actually been sustained, but if the uncertainty lies only in the amount of damages, recovery may be had if there is proof of reasonable basis from which the amount may be inferred. Anderson v. Mt. Clemens Pottery Co., 328 U. S. 680, 688, 66 S. Ct. 1187, 90 L. Ed 1515; Eastman Kodak Co. v. Southern Photo Materials Co., 273 U. S. 359, 47 S. Ct. 400, 71 L. Ed. 684; Chalender v. United States, 119 F. Supp. 186; Annotation, 78 A. L. R. 858.

Southern was damaged to some extent. It is certain that either brick or mortar had to be used to fill the spaces left by the short brick. When the shortage is multiplied several hundred thousand times, the damage becomes substantial. It is the proof of the measure of damages which the trial court felt was inadequate and has given us the most difficulty.

██ The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach. Section 554.70, Code of Iowa; Gildner Bros. v. Ford Hopkins Co., 235 Iowa 191, 16 N.W.2d 229. This includes all reasonable expenses incurred as a result of the injury. 25 C. J. S. 524, Damages, section 45. Eagle Iron Works v. Des Moines Suburban Ry. Co., 101 Iowa 289, 70 N.W. 193; Mayne & McGregor on Damages, Twelfth Ed., page 29. It is the injured party's duty to reduce the damage flowing from the wrongful act as much as possible and it is entitled to

recover the expense incurred in attempting to reduce the damages. 25 C. J. S., Damages, sections 34, 49, pages 502, 531; Trunk & Gordon v. Clark, 163 Iowa 620, 145 N.W. 277. The party accused of the wrongful act has the right to show facts surrounding the injury complained of which tends to reduce the amount required for just compensation to the injured party. 25 C. J. S. 643, Damages, section 96.

Southern's procedure in using the short brick furnished minimized the damages. Mason City would not take the brick back. The cost of delaying construction until this matter could be determined would have been prohibitive. As the quality of the brick was not questioned, Southern's only reasonable course of conduct was to use the short brick and claim damages for the extra expense resulting from such use.

Southern sought to prove the amount of damages by applying the percentage by which the bricks actually furnished varied from the specified length to the total number of bricks actually used, thereby arriving at the number of extra bricks required because of the deficiency in size. To the cost of these extra brick was added the additional expense of laying them including transportation charges, labor, mortar, insurance, overhead and a 10 percent profit.

Mason City offered proof that the building was to be of modular construction and each brick plus one vertical mortar joint was to be 12 inches in length and claims no extra brick would be needed because the joints could be varied to arrive at the 12-inch length.

Southern claims they were limited in the amount they could vary the vertical joints by the custom of the trade as to what is good workmanship in the relationship between horizontal and vertical joints. The specifications called for horizontal joints between $\frac{3}{8}''$ and $\frac{7}{16}''$ and vertical joints should be the same width allowing a tolerance of $\frac{1}{16}''$.

Southern claims they tried to keep within the $\frac{1}{16}''$ tolerance and that necessarily additional brick was required proportionate to the percentage of shortage; although they do concede in some instances conditions were met by widening the joints. There is no evidence tending to show how often the instances

occurred. It would have been a very expensive, if not impossible, task to keep a course-by-course count on the additional brick.

"While the difficulty of proving the amount of damages from the breach of a contract is no reason why recovery should be denied altogether, and a defendant who has voluntarily breached a contract cannot demand proof of plaintiff's damages therefrom with great particularity or exactness, nevertheless plaintiff must prove a definite or reasonable basis for the computation on which he relies." 25 C. J. S. 832, Damages, section 162.

The computation made by Southern furnished a reasonable basis from which the trial court could have arrived at an amount which would compensate Southern for the injury sustained. Southern claimed they had to purchase and lay this number of additional brick because of the deficiency. Evidence was introduced by Mason City that tended to show the deficiency could have been cured by widening the joints, but there is no evidence as to the number of short courses of brick or the cost of additional mortar and labor in expanding the joints. It would have been proper for Mason City to offer evidence of this nature to show facts surrounding the injury complained of which tend to reduce the amount required to justly compensate the injured party. 25 C. J. S. 643, Damages, section 96.

Loss of profits which is shown as a separate figure in the evidence is not a proper measure of damages in the instant case. There was a contract price in which the profit element was considered. Southern was damaged only to the extent its expenses were increased. If it is allowed compensation for these additional expenses, it is made whole and it is not entitled to an additional profit on these expenses. There is no proof that additional overhead costs were incurred because of the additional brick needed. This element of damages is also disallowed.

 Southern computed the total damages to be $3158.76, including overhead expense of $261.05 and a profit of $287.16 which we have disallowed. The removal of these items reduces Southern's computation to the sum of $2610.55. This figure is based upon the assumption that additional bricks were used in all instances. Southern has conceded that in some instances

conditions were met by widening the joints. There is evidence this could be done easily in short spans of brick. We believe it reasonable to estimate Southern was able to meet conditions by widening the joints about one third of the time. We therefore reduce the amount arrived at in the computation by one third resulting in damages of $1740.37. There is no question the amount due Mason City for the last load of brick is $1218.72. Therefore Southern is entitled to judgment against Mason City in the amount of $521.65 together with costs.

The case is reversed and remanded for judgment in accordance herewith.—Reversed and remanded.

All Justices concur.