**Juan VALLEJO, Plaintiff-Appellee,**

v.

**JAMESTOWN COLLEGE, a corporation, Defendant-Appellant.**

No. 9203.

Supreme Court of North Dakota.

July 29, 1976.

Hjellum, Weiss, Nerison, Jukkala & Vinje, Jamestown, for appellant; argued by John Hjellum, Jamestown.

Daniel J. Chapman, Bismarck, for appellee.

SAND, Justice.

This is an appeal by the defendant Jamestown College from a jury verdict in the district court of Stutsman County awarding the plaintiff Juan Vallejo $25,000 because of the College's breach of a contract of employment.

The College, on appeal, maintains that the sole and only issue is whether or not it had the right in accordance with its articles of incorporation, the faculty manual, and the laws of the State of North Dakota, to refrain from renewing the existing contract between Vallejo and itself because of financial exigencies and low enrollment in the academic area for which Vallejo had responsibility. The College argues that the consideration of any other matter was surplusage, irrelevant and immaterial.

Vallejo in response states that he does not dispute that the College had the right to not renew his contract, but he disputes that the College in fact refused to renew for the stated reasons and claims that the College refused to renew his contract for other reasons more fully set out and discussed later herein. Vallejo claims the issue more concisely stated is as follows:

"Does the evidence sustain the verdict of the jury in favor of Vallejo on his

contention that the real reasons for the nonrenewal were other than stated in the letter to him and were in fact a denial to him of academic freedom without due process of law, contrary to the faculty manual."

Vallejo was employed by the College as instructor and acting chairman of the Department of Modern Foreign Languages. On December 15, 1972, Vallejo was offered a contract for the nine-month period beginning September 1, 1973. Vallejo accepted this contract by signing it on January 5, 1973.

On December 15, 1973, Vallejo was advised that "because of financial exigencies and/or low enrollments in the academic areas for which you have had a responsibility" he would not be offered a contract for the 1974–1975 academic year.

The College claimed that this action was taken at the discretion of the Board of Trustees of the College because the College was in a poor financial position, and that the overall staff reduction and consolidation scheme, of which Vallejo's nonrenewal was only a part, would result in a savings of funds.

Vallejo claimed that the real reason his contract was not renewed was because of clashes with the administration over academic matters. He claims that he has been denied his academic freedom as provided for in the faculty manual and has been separated from his position without due process of law, and that the failure of the College to follow the provisions of the faculty handbook is a breach of the contract between himself and the College.

The jury found that there had been a breach of contract and awarded damages of $25,000 to Vallejo.

The College, on appeal, asks that the jury verdict be set aside and that we conclude that the Board of Trustees of the College did have the right to terminate Vallejo's employment. The College also claims that the award of damages is excessive.

At the time this fact situation arose, Jamestown College was suffering from a severe shortage of funds, due to low enrollment, increases in faculty salaries, inflation, and difficulty in finding private funds. The College had studies of its situation conducted previously, from which it had determined that the College was overstaffed and that cuts would have to be made.

Concurrent with the financial straits of the College were low enrollments in the Language Department. The Language Department in the school year of 1973–74 was comprised of Professor Vallejo, chairman; Professor Wirtz, who taught Jamestown College students in Basel, Switzerland; and Professor Valentine, who was a part-time instructor. A plan was devised whereby these three instructors would be replaced by one professor capable of teaching French, German, and Spanish. It had been determined that all three of these languages should be offered by the College. None of those professors employed by the College was capable of teaching all three languages, so a new professor would have to be found. This replacement was to have a Ph.D. and would be paid at a higher salary than any of the others had been, but this would still be lower than the composite salaries of the three teachers whose contracts would not renewed. The College calculated that the plan would result in a savings of $17,164 for the school year 1974–75. The Board of Trustees adopted this plan and informed Professors Vallejo, Wirtz, and Valentine that because of the financial exigencies and low enrollment their contracts would not be renewed.

Article V of the Articles of Incorporation of Jamestown College grants to the Executive Committee of the Board of Trustees "full authority and plenary power in the conduct of the financial affairs, selection of the college faculty and any and all business of and pertaining to said Jamestown College." The College claims that under this Article the Board of Trustees has the power to not renew contracts of faculty members whenever there are valid reasons and that any disputes that Vallejo may have had with the administrator are not significant, because it is the Board of Trustees and not

the President who determine changes in faculty, and there are valid reasons present here for the "nonrenewal" of Vallejo's contract.

Vallejo alleges that the action taken against him was not based upon a lack of enrollment or financial exigency as the Board claimed, but on something else, because he had offered a plan whereby the Language Department could be run for less money and more competently than under the plan adopted by the Board.

Vallejo contends that behind the "nonrenewal" was the fact that he had clashed on occasion with the President, Dr. Roy Joe Stuckey, and the President's sister, Dr. June Stuckey, and that he had failed to yield to pressure to give a passing grade to one of his students whose parents had some influence with the College. Vallejo testified that in conversations with Dr. Roy Joe Stuckey subsequent to the "nonrenewal" he was informed that the real reasons for his dismissal were the altercations with Dr. June Stuckey, the failing grades, and his failure to support the administration.

Vallejo also testified that after he received his letter of "nonrenewal" on December 15, he was informed by Dr. Andresen, the Dean of the College, that he was going to be rehired and not to worry about anything. Relying upon this assurance, Vallejo did not challenge the dismissal and did not exercise his right to appeal, but maintained a low profile.

The faculty manual, on page 18, under the heading "Statement of Academic Freedom," states: "Faculty, whether tenured or not, will enjoy the benefits of academic freedom and will not be separated from their positions in cases of alleged violation of academic freedom without due process."

Vallejo states that he was fired and his academic freedom under this paragraph was violated because of his failure to change a student's grade, because of his criticism of the Basel program, and because, as the administration claimed, he failed to support the College.

It is Vallejo's contention that this "Statement of Academic Freedom" is part of the contract between himself and the College. He claims that, as his academic freedom has been violated, the College has breached its contract, and the fact that the Board of Trustees did not know of this violation but believed the reason for the nonrenewal was one of financial exigency, does not matter. Vallejo claims that because the College, acting through its administrative officers, has violated his academic freedom, the good faith of the Board is no defense.

■ After analyzing these contentions, we believe the overriding issue is whether the jury accepted Vallejo's version of the dismissal, or the College's version. This ultimately brings us to the question of fact which is to be resolved by the jury. The jury made its decision and on appeal we are limited in our review of such decision in accordance with the appropriate rules of law. We do not substitute our judgment for that of the jury. This narrows the question down to whether or not there was sufficient evidence to sustain the verdict of the jury.

In determining the sufficiency of the evidence to sustain the verdict of the jury, we must view the evidence in the light most favorable to the verdict. *Lovas v. St. Paul Insurance Companies,* 240 N.W.2d 53 (N.D. 1976); *Kresel v. Giese,* 231 N.W.2d 780 (N.D.1975); *Buehner v. Hoeven,* 228 N.W.2d 893 (N.D.1975); *Waletzko v. Herdegen,* 226 N.W.2d 648 (N.D.1975).

Our review of the facts is limited to consideration of whether there is substantial evidence to sustain the verdict; if there is, we are bound by the verdict even though there was conflicting evidence. *Kresel, supra; Waletzko, supra.*

■ After having examined the evidence in this case we must conclude that there is sufficient evidence to sustain the verdict of the jury. Consequently, we have no justification for setting aside the verdict and, therefore, the verdict of the jury on the question of liability for breach of contract must be affirmed. We, however, need

to resolve the further question as to the amount of damages.

The College argues that in the event we find adversely as to the first issue (liability), then the second issue becomes relevant, and that is whether or not the damages given by the jury were excessive and appeared to have been given under the influence of passion or prejudice.

Basically, as to the question of damages, we are concerned with the law relating to the damages for breach of contract.

The general rule in the case of a breach of contract is that the measure of damages is the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented or the breach of it has entailed. The person injured is, as far as it is possible to do so by monetary award, to be placed in the position he would have been in had the contract been performed. 25 C.J.S. Damages § 74, p. 843.

■ Generally, damages for breach of contract are limited to the pecuniary loss sustained. Exemplary damages are not recoverable in an action for breach of contract unless the breach amounts to an independent, willful tort, in which event exemplary damages may be recovered under proper allegations of malice, wantonness, or oppression. 22 Am.Jur.2d Damages § 245, p. 337; *Johnson v. Radde,* 293 Minn. 409, 196 N.W.2d 478 (1972).

■ A wrongfully discharged employee is entitled to recover the necessary and reasonable expenses incurred by him in seeking or obtaining other employment.

These have been held to include travel in search of a job, telephone calls, and the expense of moving a family to the place of new employment. See 84 A.L.R. 171.

■ The North Dakota Legislature, through § 32–03–09, North Dakota Century Code, has set out the measure of damages for breach of contract, which provides as follows:

"For the breach of an obligation arising from contract, the measure of damages, except when otherwise expressly provided by the laws of this state, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby or which in the ordinary course of things would be likely to result therefrom. No damages can be recovered for a breach of contract if they are not clearly ascertainable in both their nature and origin."

This statutory provision is, in effect, the adoption of the common law rule. See *Hayes v. Cooley,* 13 N.D. 204, 100 N.W. 250 (1904), and *Needham v. H. S. Halverson & Co.,* 22 N.D. 594, 135 N.W. 203 (1912).

The Legislature also provided in § 32–03–36, NDCC, that the recovery of damages could not be more than that which would have been gained by performance. In § 32–03–37, NDCC, it is further provided that the damages must be reasonable.

In *Hayes v. Cooley, supra,* the court, in discussing the meaning of the statutory provision, quoted with approval from *Griffin v. Colver,* 16 N.Y. 489, 69 Am.Dec. 718:

"The damages must be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract—that is, must be such as might naturally be expected to follow its violation; and they must be certain, both in their nature and in respect to the cause from which they proceed. The familiar rules on the subject are all subordinate to these. For instance, that the damages must flow directly and naturally from the breach of contract is a mere mode of expressing the first; and that they must be not the remote, but proximate, consequence of such breach, and must be not speculative or contingent, are different modifications of the last."

The court also quoted with approval from *Hadley v. Baxendale,* 9 Ex. 341, 23 L.J.Ex. 179, 17 Jur. 358, 26 E.L. & E. 398:

"Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect to such breach of contract should be such as may fairly and reasonably be considered either arising

naturally, i. e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach."

Later, in 1911, the same principles of law were followed in the case of *Russell v. Olson*, 22 N.D. 410, 133 N.W. 1030.

In *Miller v. South Bend Special School District No. 1*, 124 N.W.2d 475, 479 (N.D. 1963), the court said:

"In an action for breach of contract by a public school teacher, the measure of damages is the wages which would have been paid under the contract alleged to have been breached, less any sum actually earned or which might have been earned by plaintiff by the exercise of reasonable diligence in seeking and obtaining other similar employment. *Blood v. Spring Creek Number 12, Common School Dist.*, 78 S.D. 580, 105 N.W.2d 545, at 548."

The court sustained the district court which allowed the school teacher damages for wages he would have been paid under the contract from the date of the discharge to the end of the term of the contract less the amount of money he earned to the date of the trial and the money he could reasonably have earned at the same rate to the end of the term for the part-time employment he had parking cars in the parking lot in Minot.

The court also referred to § 32–03–09, NDCC, and noted that a portion of the statute provides "no damages can be recovered for a breach of contract if they are not clearly ascertainable in both their nature and origin."

■ In the case of a breach of contract, the injured party must make every reasonable effort to minimize the damages suffered. *Stetson v. Investors Oil, Inc.*, 140 N.W.2d 349 (N.D.1966); *Nicola v. Meisner*, 84 N.W.2d 702 (N.D.1957).

■ It is the duty of an employee who has been wrongfully discharged to exercise ordinary diligence to procure other employ-

ment and thus to reduce damages. However, any expenditures made by the non-defaulting party may be recovered, providing they are a reasonable effort to minimize losses. *Natkin & Company v. R. F. Ball Construction Company*, 123 N.W.2d 415 (Iowa 1963); 84 A.L.R. 171.

In *McLean v. News Publishing Co.*, 21 N.D. 89, 129 N.W. 93 (1910), the court had under consideration a breach of a contract and held that the plaintiff was entitled to recover as an element of his damage what his time was reasonably worth up to the time of the breach of the contract less, of course, the amount received by him, and that the offered proof of his earning capacity at the time he entered into the contract in his law business at Langdon tended to furnish some proof as to such value; hence it was error to deny this offer of proof. The court also allowed reasonable expenses incurred by him in moving from Langdon to Fargo, as such expenses were fairly within the contemplation of the parties at the time the contract was entered into.

■ There is no certain or definite rule by which the amount of damages can be measured, and each case must be determined on its merits. This determination is in the province of the jury and the matter of damages rests largely in the sound discretion of the jury. *Rodriguez v. Slattery*, 54 Wis.2d 165, 194 N.W.2d 817 (1972); *Froemke v. Hauff*, 147 N.W.2d 390 (N.D. 1966); *Kuntz v. Stelmachuk*, 136 N.W.2d 810 (N.D.1965); *Woode v. Kabela*, 256 Iowa 622, 128 N.W.2d 241 (1964); *Husak v. Omaha National Bank*, 165 Neb. 537, 86 N.W.2d 604 (1957). Before this court will interfere with the verdict on appeal, it must be so excessive or so inadequate as to be without support in the evidence. *Strandness v. Montgomery Ward*, 199 N.W.2d 690 (N.D. 1972); *Froemke v. Hauff, supra; Kuntz v. Stelmachuk, supra.*

■ The injured person is limited to the loss actually suffered by reason of the breach. He is not to be put in a better position by a recovery of damages than he would have been if there had been performance. 25 C.J.S. Damages § 74, p. 849.

■ The purpose of an award of damages is to compensate for an injury. It is for the jury to determine the compensation to which the party is entitled within reasonable limits, based upon the evidence. If those limits have been exceeded by the jury, it is the duty of the court to make a proper reduction or grant a new trial. *Mevorah v. Goodman,* 68 N.W.2d 469 (N.D.1955); *Leonard v. N. D. Co-op. Wool Market. Ass'n,* 72 N.D. 310, 6 N.W.2d 576 (1942).

North Dakota Civil Procedure Rule 9(g), on special damages, provides as follows:

"When items of special damage are claimed, they shall be specifically stated."

The term "special damages" is found in Black's Law Dictionary (4th ed.), as follows:

"Those which are the actual, but not the necessary, result of the injury complained of, and which in fact follow it as a natural and proximate consequence in the particular case, that is, by reason of special circumstances or conditions. [Citations omitted.]"

As to special damages, this court in *Bumann v. Maurer,* 203 N.W.2d 434, 440 (N.D. 1972), said:

"It is a rule of evidence of long standing in this jurisdiction that unless pleaded, special damages are not ordinarily to be allowed. *Shoemaker v. Sonju,* supra [15 N.D. 518, 108 N.W. 42]; *Russell v. Olson,* 22 N.D. 410; 133 N.W. 1030, . . *Spalding v. Loyland,* 132 N.W.2d 914, 924 (N.D.1964)."

■ The complaint in this case sought an injunction against the defendant College or "for damages, in the alternative, for the sum of $25,000 for breach of the contract." It may be doubtful that this language fulfills the requirements of Rule 9(g), NDRCivP, the principal object of which is to inform the adverse party of the nature of the claim and thus prevent surprise at the trial.

However, evidence was introduced by Vallejo without objection by the College. In *Bumann v. Maurer, supra,* this court said:

"But the rule need not be applied with unyielding rigor where the reason for its existence does not subsist."

Because no objections were raised in the introduction of the evidence relating to special damages, we may assume that the College tacitly or impliedly waived the requirements of Rule 9(g), NDRCivP. In any event, even though the testimony and evidence are not sufficiently clear in every respect as to the damages sustained, we have them before us on review and we should make a fair and reasonable disposition on the question of damages.

The jury awarded Vallejo $25,000 in damages, which was the amount he asked for in the complaint.

A breakdown of the damages that Vallejo claims, based on his testimony and evidence, is as follows:

—Although his new salary at Daly City is $12,400, compared with $9,680 at Jamestown College, he claims he sustained damages because living expenses in California are "much, much higher" and "I can buy more things with my salary here [Jamestown] than with my salary in California."

—Vallejo claims he had moving expenses of $1,200 and costs of $250–300 in bringing his family to California.

—He paid $400 for a trip to New Jersey to interview for a new job.

—He also drove 800–1000 miles in going for interviews in California.

—The phone bill for calls in his search for a new job was approximately $100.

—After moving to California, Vallejo was separated from his wife for a month and a half. He claims it cost him $10 a day for meals, and $15 a day for meals for his wife and children. He also traveled 200 miles each weekend to see her.

—In his new job, Vallejo must drive 30 miles, one way, to work each day. He no longer can go home for lunch. He paid $4,300 for a new car which it was necessary for him to purchase because of all the traveling he must now do. His insurance rates

for the car are $170 higher than he paid in North Dakota.

It can be readily observed that there are several items on which the dollar value is unknown, which need to be determined first before a precise dollar damage amount can be reached. The jury is entitled to reasonable latitude on such matters. However, even if the jury applied maximum dollar amounts for mileage and some of the other unknown dollar values, and assuming the jury gave Vallejo the benefit of the doubt, we find it difficult, if not impossible, to find evidence justifying or supporting the $25,000 amount.

We do not believe the value of the car purchased can be considered damages, at least not as to the full purchase price. But even if the purchase of the car were included as damages, the total amount would be far short of $25,000. We conclude that such amount is excessive.

The amount of $15,000 would be more accurate and would give Vallejo the benefit of computing damages on the maximum allowable for such things as mileage and other unknown matters in which no precise dollar value was given.

We, therefore, remand the case with instructions that unless Vallejo agrees to a reduction or remission of damages to $15,-000 within ten days after the remand, a new trial on the question of damages alone is granted.

ERICKSTAD, C. J., and PEDERSON, J., concur.

VOGEL, Justice (dissenting).

I dissent.

I cannot conclude that the damages in this case are so excessive and without support in the evidence that we are justified in substituting our judgment for that of the jury. If this case involved an issue such as the value of wheat or a new automobile, or any other question as to the amount of damages subject to precise determination, and if the jury had given an award far in excess of the correct amount, I would agree that we could grant a remittitur. But here we are dealing with damages affecting the career of a professional man for years to come. In such an area, the range of permissible verdicts is much wider, and we should be most reluctant to second-guess juries.

This case is further complicated by the fact that the plaintiff attempted to prove damages to his professional future because of the nonrenewal of his teaching contract, but the trial court did not allow him to do so. He made an offer of proof that he was unable to obtain employment in any of the fifty or so colleges he applied to, that his unemployability in any college was due, in his opinion, to the wrongful nonrenewal of his contract by Jamestown College, and that he was thereby damaged in the sum of $10,000 to $12,000. I believe that this offer of proof was proper, although the trial court rejected it, and the evidence should have been admitted.

All in all, I believe that the evidence received was sufficient to justify the verdict, giving full scope to the wide range of discretion permitted the jury in fixing damages, and that the verdict was not excessive (particularly in view of the error in disallowing the offer of proof), and I conclude that this is not one of the cases (which should be very rare) where we should substitute our judgment for that of a jury.

Incidentally, I do not entirely agree with the comments in the majority opinion on special damages. The test of allowability of damages in contract cases is that of reasonable anticipation. Our statute allows damages "which in the ordinary course of things would be likely to result" from the breach of contract. Sec. 32–03–09, N.D. C.C. I believe that expenses of seeking new employment, travel to the site of the new employment, the additional expense of commuting at that site, and even inability to find college employment, with consequent loss of status involved in having to begin work anew at the high-school level,

are all general damages reasonably to be anticipated, and are not "special" damages. Since our early cases on the pleading of special damages were decided, we have adopted rules of procedure which permit the utmost generality in pleading and allow defendants to acquire detailed information by the use of the discovery procedures if they choose to do so. I believe that the complaint in this case used appropriate language, that the defendant could have obtained an itemization of damages by discovery but did not do so, and that Rule 9(g), N.D.R.Civ.P., does not apply.

I would affirm.

PAULSON, J., concurs.