Clarence DEGENSTEIN, by and through Philip Degenstein, his Guardian ad litem, Plaintiff,

v.

Jake EHRMAN, Jr., Eldon Ehrman, a minor, by Jake Ehrman, Jr., his Guardian ad litem, Larry Gehring, a minor, by Jake Gehring, his Guardian ad litem, Defendants.

Eldon EHRMAN, a minor, by Jake Ehrman, Jr., his Guardian ad litem, Cross-Complainant and Respondent,

v.

Larry GEHRING, a minor, by Jake Gehring, his Guardian ad litem, Defendant and Appellant.

No. 8218.

Supreme Court of North Dakota.

Oct. 13, 1966.

**496**

McGee, Van Sickle & Hankla, Minot, for appellant.

Vogel, Ulmer & Bair, Mandan, and J. O. Thorson, McClusky, for respondent.

Dale Jensen, Asst. Atty. Gen., Bismarck, for Unsatisfied Judgment Fund.

ERICKSTAD, Judge (on reassignment).

Clarence Degenstein, a minor who was a passenger in an automobile driven by Llewellyn Rauser, brought an action through his guardian ad litem against Jake Ehrman, Jr., his minor son Eldon Ehrman, and Larry Gehring, also a minor, for damages for personal injuries sustained in an automobile accident which occurred when an automobile owned by Jake Ehrman, Jr., collided with an automobile owned by Llewellyn Rauser's father.

The defendant Eldon Ehrman, through his guardian ad litem, filed a cross-claim against the defendant Larry Gehring for damages Eldon suffered as a result of personal injuries incurred in the same accident. An answer was duly returned to the cross-claim. Eldon also brought a separate action against Llewellyn Rauser, the driver of the vehicle owned by Llewellyn's father, for damages for personal injuries arising out of the same accident. The claim of the plaintiff, Clarence Degenstein, was settled prior to trial of the cross-claim. Eldon's cross-claim against Larry Gehring was consolidated for trial with his claim against Llewellyn Rauser.

This appeal is from the judgment of the District Court of Sheridan County based on a jury verdict in favor of the cross-complainant, Eldon Ehrman, and against the defendant Larry Gehring in the sum of $26,541, plus costs, and from the order of the district court denying the motion of the defendant Larry Gehring for judgment notwithstanding the verdict or in the alternative for a new trial.

The first basic issue we are faced with on this appeal is whether the trial court erred in refusing to instruct the jury that the cross-complainant, Eldon Ehrman, was a guest in the automobile owned by his father and driven by the defendant Larry Gehring, within the intent of the North Dakota guest law, barring recovery against the said defendant based only on ordinary negligence.

The facts as to this issue are undisputed.

The action by Eldon Ehrman is for the recovery of money damages for personal injuries he sustained as a result of an automobile accident on December 1, 1962, which occurred one mile south of Anamoose on State Highway 14.

At the time of the accident Eldon was riding in a car owned by his father Jake Ehrman, Jr., and driven by his friend and school classmate, Larry Gehring. The accident occurred when the vehicle driven by Larry collided with a vehicle driven by Llewellyn Rauser.

Eldon lives with his parents on a farm 3½ miles south of Anamoose. About 7:00 p. m. on a Saturday evening Eldon drove his parents to Anamoose in a 1959 Ford automobile owned by his father Jake Ehrman, Jr. When they arrived in Anamoose Eldon parked the car and went into the drugstore. His parents went to a wedding shower and party in the Vets' Hall. As Eldon came out of the drugstore he saw his friends Llewellyn Rauser and Larry Gehring driving around in a 1958 Chevrolet automobile owned by Llewellyn's father Berthold Rauser. They stopped and Eldon got into the car with them.

The three drove around town in the Rauser car for a while and then drove to the Wesley Schilling farm located 5 miles southwest of Anamoose to see Llewellyn's girl friend. When they returned to Anamoose, they parked the Rauser car and got into the Ehrman car. The three then drove around town in the Ehrman car. During this time Llewellyn asked and was given permission by Eldon to drive the Ehrman car. While driving the Ehrman car, Llewellyn made a second trip to the Schilling farm to see his girl friend. When they returned to Anamoose, they decided to go to the wedding party at the Vets' Hall. At the wedding party all three had some beer. At about 10:45 p.m. Eldon and Larry left the wedding party together. At this time Larry began driving the Ehrman

car and Eldon rode in the right front seat. Larry drove the Ehrman car to the old school gym, where they picked up five other boys, who got into the back seat. All were schoolmates of Larry and Eldon, and all were about fourteen or fifteen years of age.

Eldon testified that he could not recall anything that happened from the time the five boys got into the back seat of the Ehrman car until after the accident.

Upon leaving the old school gym, Larry, with Eldon in the front seat and the other five boys in the back seat, drove around town and then south to the intersection of Highways 52 and 14. As Larry proceeded south in the Ehrman vehicle, Llewellyn Rauser and his friend Clarence Degenstein began following in the Rauser vehicle. When Larry stopped for the stop sign at the intersection of Highways 52 and 14, the Rauser vehicle drove alongside the Ehrman vehicle.

As the two vehicles drove south on Highway 14, the Ehrman vehicle was on the right side of the highway, and the Rauser vehicle was on the left side. Soon after the vehicles left the intersection, the Rauser vehicle pulled in front of the Ehrman vehicle. About a mile down the road the Rauser vehicle drove off Highway 14 at a point where it is intersected by a gravel road. The two vehicles collided when the Rauser vehicle re-entered the highway.

Our guest statute reads as follows:

39-15-01. "Guest" defined.—"Guest" shall mean and include a person who accepts a ride in any vehicle without giving compensation therefor.

39-15-02. Liability for injury to or death of guests.—Any person who as a guest accepts a ride in any vehicle moving upon any of the public highways of this state, and who while so riding as such guest receives or sustains an injury, shall have no right of recovery against the owner or driver or person responsible for the operation of such vehicle. * * *

39–15–03. When driver of motor vehicle liable for injury or death.—The provisions of this chapter shall not be construed as relieving the owner, driver, or person responsible for the operation of a vehicle from liability for injury to or death of a guest proximately resulting from the intoxication, willful misconduct, or gross negligence of such owner, driver, or person responsible for the operation of such vehicle. In any action for death or for injury or damage to person or property by or on behalf of a guest or the estate, heirs, or legal representatives of such guest, the burden shall be upon the plaintiff to establish that such intoxication, willful misconduct, or gross negligence was the proximate cause of such death, injury, or damage.

North Dakota Century Code.

In Ledford v. Klein, a decision rendered by this court in 1957, we said:

The question as to who is a guest within the contemplation of our statutes, fixing the liability of the owner or operator of the motor vehicle for injury to a guest, is largely a question for determination in each individual case upon the peculiar facts thereof. Jacobs v. Nelson, 67 N.D. 27, 268 N.W. 873.

Ledford v. Klein, 87 N.W.2d 345 (N.D. 1957), at 348.

*Ledford* quoted from Blashfield as follows:

"One important element in determining whether a person is a guest within the meaning and limitations of such statutes (guest statutes) is the identity of the person or persons *advantaged by the carriage*. If, in its direct operation, it confers a benefit only on the person to whom the ride is given, and no benefits, other than such as are incidental to hospitality, companionship, or the like, upon the person extending the invitation, the passenger is a guest within the statutes; but, if his carriage tends to the promotion of mutual interests of both himself

and the driver and operates for their common benefit or if it is primarily for the attainment of some objective or purpose of the operator, he is not a guest within the meaning of such enactments." 4 Blashfield, Cyclopedia of Automobile Law and Practice, Part 1, Perm.Ed., Sec. 2292, pgs. 307–310 (Emphasis supplied). Ledford v. Klein, supra, at 348.

In Syllabus 5 of that case we said:

Under ordinary circumstances the status of a guest is not changed by reason of the fact that he does a part of the driving. Such benefit is too trivial or inconsequential to change the relationship of the parties. The relationship which gives rise to the status of a passenger must confer something of a tangible nature upon the owner, driver, or the person responsible for the operation of a motor vehicle.

We believe that if the status of a guest is not changed by reason of the fact that he does a part of the driving, it logically follows that the status of a host (or, as in this case, the status of the bailee of the owner) is not changed by reason of the fact that he permits his guest to do a part of the driving.

The United States Circuit Court of Appeals construed the Michigan guest statute in Baldwin v. Hill, 315 F.2d 738 (6 Cir. 1963). In that case the daughter of the car's owner permitted her boy friend to drive while she remained in the front seat. An accident occurred, resulting in injury to the daughter. The court said that under Michigan law whether a person is a guest within the meaning of the guest act is a question of fact if the evidence as to the nature of the relationship between the parties is in conflict or is susceptible of different constructions, but that if the facts from which the question of host-guest relationship arises are not in dispute, it is only the legal effect of the facts which is at issue.

In holding that the daughter was not a guest as a matter of law the court cited with approval Collie v. Aust, 173 Cal.App. 2d Supp. 793, 342 P.2d 998, as follows:

* * * In that case, the plaintiff borrowed a jeep from the owner to take on a hunting trip. While he was on such trip, plaintiff allowed the defendant, one of his companions, to drive the jeep. While defendant was operating the vehicle, an accident occurred with resultant injuries to plaintiff. In holding that plaintiff was not a guest within the meaning of the California "guest act" the court said:

"Neither was the plaintiff the guest of Aust. He did not accept a ride from Aust. His situation is similar to that of an owner who has been held not to be the guest of the driver while riding in his own car." * * *

In *Baldwin* the circuit court commented further as follows:

As the California court noted, the majority of the decided cases hold that the owner of an automobile is not the guest of the driver while riding in his own car. Gledhill v. Connecticut Co., 121 Conn. 102, 183 A. 379 (1936); Lorch v. Eglin, 369 Pa. 314, 85 A.2d 841 (1952); Ahlgren v. Ahlgren, 152 Cal.App.2d 723, 313 P.2d 88 (1957); Naphtali v. Lafazan, 7 Misc.2d 1057, 165 N.Y.S.2d 395 (1957) affirmed 8 A.D.2d 22, 186 N.Y.S.2d 1010; Leonard v. Helms, 269 F.2d 48 (C.A. 4, 1959); Parker v. Leavitt, 201 Va. 919, 114 S.E.2d 732 (1960); Henline v. Wilson, 111 Ohio App. 515, 174 N.E.2d 122 (1960), (motion to certify to Supreme Court of Ohio overruled 1960); Peterson v. Winn, 84 Idaho 523, 373 P.2d 925 (1962). See Annotation, 65 A.L.R.2d 312. The rationale underlying these decisions is that the host-guest relationship is dependent in large measure upon the furnishing of hospitality by the host to the guest. Since the owner-passenger is the one extending the hospitality—furnishing the mode of transportation—to the driver, the owner-passenger is the host and the driver is the guest. * * *

Baldwin v. Hill, 315 F.2d 738 (6 Cir. 1963), at 740–741.

■ As the facts from which the question of host-guest relationship arises are not in dispute in the instant case, we believe that it was proper for the trial court to decide as a matter of law that Eldon, the son of the owner of the Ehrman vehicle, was not a guest of Larry Gehring, who at the time of the accident was driving the Ehrman vehicle with Eldon's consent.

Some would argue that *Baldwin* may be distinguished from the instant case because the State of Michigan follows the rule that a statute which is in derogation of the common law must be strictly construed, whereas we have a rule of construction embodied in § 1–02–01, N.D.C.C., to the opposite effect. That section reads as follows:

1–02–01. Rule of construction of code.—The rule of the common law that statutes in derogation thereof are to be construed strictly has no application to this code. The code establishes the law of this state respecting the subjects to which it relates, and its provisions and all proceedings under it are to be construed liberally, with a view to effecting its objects and to promoting justice.

North Dakota Century Code.

It is pointed out by the appellant that the leading decision, Gledhill v. Connecticut Co., 121 Conn. 102, 183 A. 379, and others which have followed it, holding that an owner of an automobile who rides therein while a friend drives does not become a guest of the friend simply because he permits the friend to drive, were decided in states that follow the rule that statutes passed in derogation of the common law must be strictly construed.

Although it may be true that Connecticut has such a rule, we believe that it is significant that the court in rendering its decision in *Gledhill* did not rely on or refer to such a rule to support its decision.

Instead of relying on this rule to support its decision in construing the guest statute, the court said:

* * * It [the Connecticut guest statute] denies to a certain class of passengers in an automobile a right to recover compensation from the owner or driver for injuries received by reason of the negligence of either in its operation, and the construction of the statute "should not be extended beyond the correction of the evils and the attainment of the permissible social objects which, it may be assumed, were the inducing reasons for its enactment." Russell v. Parlee, 115 Conn. 687, 692, 163 A. 404, 406; Silver v. Silver, 280 U.S. 117, 122, 50 S.Ct. 57, 74 L.Ed. 221, 65 A.L.R. 939. "The purpose of this legislation was to deny a recovery for negligence against one transporting in his automobile a member of his family, a social guest, or a casual invitee in an action brought by the recipient of his hospitality." Bradley v. Clarke, 118 Conn. 641, 643, 174 A. 72, 73. It is plain that the person must be transported as a guest of the other party, and the transportation must be without payment, in order for the provisions of the statute to apply. In Walling v. Potter, 35 Conn. 183, 185, in considering whether the relationship of innkeeper and guest arose, we said that "any one away from home, receiving accommodations at an inn as a traveler, is a guest," and that "a guest is one who patronizes an inn as such." In Webster's New International Dictionary (2d Ed.) 1112, a "guest" is defined as "a person entertained in one's house or at one's table; a visitor entertained without pay; hence, a person to whom the hospitality of a home, club, etc., is extended." As used in the statute the term imports that the person riding in a motor vehicle is a recipient of the hospitality of the owner or driver. Chaplowe v. Powsner, 119 Conn. 188, 191, 175 A. 470, 95 A.L.R. 1177; Crawford v. Foster, 110 Cal.App. 81, 87, 293 P. 841; Bree v. Lamb, 120 Conn. 1, 178 A. 919.

Upon the facts claimed, there is nothing which would have warranted the jury in concluding that at the time of the accident Gledhill was the guest of Graham. The two were riding in Gledhill's automobile. They were going fishing together. The automobile was being driven by Graham at Gledhill's request, and the latter was sitting on the front seat with the driver. There is nothing from which the inference could be drawn that Gledhill was enjoying the hospitality of Graham. The most that is indicated is that Graham was performing a gratuitous service for Gledhill. Proof of this fact does not make Gledhill the guest of Graham. To hold that if the owner of an automobile is riding therein and a friend is driving, the owner is the guest of the friend simply because the friend is driving, would be to import into the statute a meaning not expressed by the Legislature.

Gledhill v. Connecticut Co., 121 Conn. 102, 183 A. 379, at 380–381.

Phelps v. Benson, a decision of the Supreme Court of Minnesota construing the South Dakota guest statute, was followed in Schlim v. Gau, 80 S.D. 403, 125 N.W. 2d 174, a 1962 decision of the Supreme Court of South Dakota construing its own statute. These decisions are heavily relied on by the appellant in the instant case. In *Phelps* the court said:

It is obvious from an examination of the cases on this subject that the law has developed largely by following the Gledhill case. Connecticut follows the rule that statutes in derogation of the common law must be strictly construed,

as does Pennsylvania. As we have shown above, South Dakota follows a rule of liberal construction. Having in mind the more liberal interpretation given these statutes by South Dakota and the purposes for which the statute was enacted as shown by Naudzius v. Lahr, 253 Mich. 216, 234 N.W. 581, 74 A.L.R. 1189, which interpretation was adopted by South Dakota when it enacted its guest law, we think that the dictionary definition of "guest" followed in the Gledhill case and in the old cases dealing for the most part with inns and homes is too restrictive as applied to these motor vehicle guest statutes.

Phelps v. Benson, 252 Minn. 457, 90 N.W.2d 533, at 541.

In *Phelps* the Minnesota court adopted the rule stated in the South Dakota case of Melby v. Anderson, 64 S.D. 249, 266 N.W. 135, to the effect that as the guest statute was taken from the law of Michigan, it would be construed and interpreted in the light of the Michigan decisions relating to it before the South Dakota legislature adopted it.

Accordingly, the court in *Phelps* quoted from the Michigan case of Naudzius v. Lahr as stating the purpose behind the enactment of its guest statute:

"It would be threshing old straw to discuss the accepted fact that the motor car has presented social, financial, and governmental problems which justify the Legislature in reasonably classifying it apart from other vehicles in the enactment of laws. L.R.A. 1918D, 134, note.

\*   \*   \*   \*   \*   \*

"Generally, gratuitous passengers are relatives or friends. Exceptionally, they are mere acquaintances, invited chance pedestrians, or those who deliberately solicit rides. Since the rule of liability was announced in Roy v. Kirn, 208 Mich. 571, 175 N.W. 475, there has been considerable litigation between guests and hosts. Some between husband and wife

or other close relatives has found its way to this court.   \*   \*   \*   In many, probably most, of the cases between relatives or friends the real defendant is an insurance company. Ordinary negligence is not hard to prove if guest and host co-operate to that end. It is conceivable that such actions are not always unattended by collusion, perjury, and consequent fraud upon the court. While we may accept the contention that paid insurers are not objects of special consideration by the Legislature, it is inadmissible for the court to consider a law from the viewpoint that they are not entitled to a proper trial and honest determination of liability in a lawsuit. Nor are insurance companies alone interested in the question. The results of verdicts are mirrored in insurance rates, and the law provides a possible reason in the purse of the motor owning public, most of whom carry liability insurance. It is not inconceivable that some passengers who solicit rides may manufacture claims for liability. Groups of young folks, engaged upon a joint enterprise of social enjoyment in a borrowed car, have been known to combine to charge the owner for an accident. The law also has social features. It is well known that drivers hesitate to take neighbors for a ride or to assist on his way a weary traveler because of potential liability for injuries. Few, if indeed any, of these features seem to have manifested themselves in the use of other vehicles than motor cars. Perhaps the Legislature also had other reasons for the law."

Phelps v. Benson, 252 Minn. 457, 90 N.W. 2d 533, at 537, quoting Naudzius v. Lahr, 253 Mich. 216, 234 N.W. 581, 74 A.L.R. 1189.

We gather, from reading this quotation, that the Minnesota court believed that the main objective of the guest statute was the elimination of collusion, perjury, and fraud, and that a liberal construction of the statute would make it applicable to the owner or, as in the instant case, to the

bailee of the owner, who permits another to drive the car while he, the bailee, rides therein.

■ We believe the true purpose of the guest statute was set forth by the United States District Court in the case of Wilson v. Workman, 192 F.Supp. 852 (Del. 1961), in which, in response to the argument that the statute was enacted to mitigate collusion among parties to automobile accidents in order to collect insurance, the court said:

> But a guest statute is no final answer to collusion. It is still possible for the dishonest to fabricate evidence to support the higher degree of fault required by the statute. 2 Harper & James, Torts 961 (1956). Moreover, there is another purpose which has been ascribed to the guest statute. Engle v. Poland, supra, 8 Terry [365] at page 328, 91 A.2d [326] at page 328, states:
>
> > "The purpose of the statute is to protect one who, generously, without accruing benefit, has transported another in his vehicle."
>
> It would run counter to this policy to read the statute to include the decedent. The evidence shows that defendant requested the privilege of driving the car. Decedent acquiesced. There is no proof or inference that by permitting defendant to drive, decedent obtained any desired benefit. Conversely, defendant continued to receive transportation at no cost with the added benefit of satisfying his desire to drive. If the statute should be construed to limit decedent's right to recover, as defendant urges, its purpose to protect one who generously provides another with transportation will be frustrated.

Wilson v. Workman, supra, at 855.

Idaho and California have statutes similar to ours to the effect that the rule of the common law that statutes in derogation thereof are to be strictly construed has no application to the code, and that all provisions of the code are to be liberally construed with a view to effecting its objects. See: Idaho Code (1947) § 73–102; West's Ann.Cal.Code, Civil, § 4. We think it is also significant that these two states have held that an owner of an automobile riding therein with a friend driving does not become a guest of the friend who is driving at the time of the accident. See: Peterson v. Winn, 84 Idaho 523, 373 P.2d 925; Collie v. Aust, 173 Cal.App.2d Supp. 793, 342 P.2d 998; Ahlgren v. Ahlgren, 152 Cal.App. 2d 723, 313 P.2d 88, at 89, and subsequent opinion, 185 Cal.App.2d 216, 8 Cal.Rptr. 218; Ray v. Hanisch, 147 Cal.App.2d 742, 306 P.2d 30, at 34.

In construing the guest statute of Virginia, the United States Court of Appeals in Leonard v. Helms, 269 F.2d 48, at 50 (4 Cir. 1959), said:

> The decisions of the Supreme Court of Appeals of Virginia give effect to the purposes of the statute by a liberal interpretation of the phrase "guest without payment", but we find nothing in them which would justify the holding in the pending case that the plaintiff-owner of the car lost his character of host and became the guest of his companion when he permitted her to drive the car for her own pleasure. * * *

The Idaho Supreme Court in *Peterson* met the argument that their guest statute required a liberal construction requiring rejection of the rule adopted in the cases following *Gledhill,* in favor of the holding of *Phelps,* by pointing out that Idaho had a statute requiring that words and phrases be construed according to the context and the approved usage of the language. They concluded by stating that the line of authority following *Gledhill* gives to the word "guest" a normal, customary construction, and that, in view of the definition of the term contained in a previous Idaho decision, the argument was without merit.

Section 1–02–03, N.D.C.C., is similar to § 73–102 of the Idaho code. Our statute reads as follows:

1–02–03. Language—How construed. —Words and phrases shall be construed according to the context and the rules of grammar and the approved usage of the language. Technical words and phrases and such others as have acquired a peculiar and appropriate meaning in law, or as are defined by statute, shall be construed according to such peculiar and appropriate meaning or definition.

North Dakota Century Code.

We therefore conclude, for the reasons stated herein, that the trial court did not err in failing to instruct the jury that Eldon Ehrman was a guest in the automobile owned by his father and driven by his friend Larry Gehring, within the intent of the North Dakota guest law.

In support of the appellant's contention that the evidence in the instant case is insufficient to justify the verdict and that the judgment should therefore be set aside, the verdict be vacated, and judgment be entered in favor of the appellant, Larry Gehring, appellant argues in his brief as follows:

During the trial of the above entitled matter, the Defendant moved the Court for a dismissal of the action at the close of the Plaintiff's case. The Defendant again moved the Court for a dismissal of the action and for a directed verdict at the close of all the evidence. The Court denied the motions. Thereafter, the Defendant made a motion for judgment notwithstanding the verdict, or in the alternative for a new trial, which motions were also denied. Denial of these motions by the Court were assigned as error on appeal. For the purpose of the argument contained in this brief, we have abstracted the above mentioned motions on the points which will be discussed, as follows:

(1) There was a total failure to show any evidence of negligence on the part of the Defendant proximately causing the injury claimed.

(2) The evidence conclusively shows that the conduct of the Plaintiff caused or contributed to cause the accident and resultant injury and by reason thereof, the Plaintiff is barred from recovery as a matter of law.

(3) That the Plaintiff assumed a risk of injury in that he, as a passenger, had knowledge of the circumstances, voluntarily chose to encounter them, and in fact, joined in the risk by sitting without warning, objection, or protest, when he has [had] adequate opportunity to influence the situation for his safety.

(4) The evidence shows that the Defendant was confronted with a sudden emergency by reason of the actions of the Plaintiff and Rauser; that he conducted himself as a reasonable and prudent person under the circumstances.

■ Questions of negligence, proximate cause, contributory negligence, and assumption of risk are ordinarily questions of fact for the jury; it is only when the evidence is such that reasonable men can draw but one conclusion therefrom that they become questions of law for the court. Grenz v. Werre, 129 N.W.2d 681, at 685 (N.D.1964); Vick v. Fanning, 129 N.W.2d 268 (N.D.1964).

■ Whether a motorist is confronted with an emergency and, assuming that he was confronted with an emergency, whether he acted negligently, are also jury questions unless the evidence is such that reasonable men can draw but one conclusion therefrom. Bauer v. Kruger, 114 N.W.2d 553, at 557 (N.D.1962).

■ In determining the sufficiency of the evidence to sustain the verdict, the evidence must be viewed in the light most favorable to the verdict. Grenz v. Werre, supra, at 685.

The credibility of the witnesses and the weight to be given to their testimony are questions of fact for the jury to determine. Grenz v. Werre, supra, 129 N.W.2d at 685.

Bearing these rules in mind, let us review the evidence pertinent to the issues raised by the appellant.

The plaintiff, Eldon Ehrman, who was very seriously injured about the head and face in the accident, had no memory of what took place on the evening of the accident from the time the five boys were picked up near the old school gym in Anamoose until sometime after the accident occurred. The only conversation concerning racing that he recalled was at the time he came out of the drugstore and entered Llewellyn Rauser's car. His testimony in that respect was as follows:

Q. Going back earlier during the time that you do remember, was there any talk about racing in your presence earlier that evening?

A. Yes. Right away when I got—after I come out of the drug store and I went to Llewellyn's car, he asked me if he could race our car and I said, "No," I didn't want to.

Q. Was that the entire conversation about racing as far as you know?

A. Yes.

Michael Vannatta, who was one of the five boys in the back seat of the Ehrman car at the time of the accident, testified that sometime before the car stopped at the intersection of Highways 52 and 14, someone said: "Let's race." His testimony in that regard was as follows:

Q. Was there any conversation between the two cars at that time?

A. Yes. First—before we went down to the intersection, we were along, someone said, "Let's race."

Q. Do you know who that was?

A. No, I can't remember for sure.

Q. Do you know what car it came from?

A. I think it was ours, the one we were riding in.

Q. Did you hear Eldon say anything?

A. Not that I remember.

He testified further as follows:

Q. All right. Then you say—What did you say about a conversation while the cars were stopped there?

A. Before we got to the stop sign I think somebody said, "Let's race."

Q. Was there any conversation when you were stopped there?

A. There probably could have been. I don't remember for sure.

Q. You didn't hear it if there was?

A. I don't remember. I probably could have heard it.

Q. What happened next?

A. We both—I don't know, we took off first or side by side, or what; I know Rauser pulled ahead of us.

Q. Did both cars start at about the same time?

A. About—

Q. Or did one start ahead of the other?

A. Could have. It was about side by side.

Q. In what direction were they going then?

A. South.

Q. Did one car take the lead?

A. Yes, Rauser's.

Q. Now, the first part of that road going south is it level, uphill, or downhill?

A. The first part is level, then it comes to a hill.

Q. And then after you get over the hill what is the situation on the road?

A. Before we hit there is a kind of a curve.

Q. What?

A. A little bit of a curve.

Q. I was thinking of the up-down part.

A. It was level.

Q. Do you know about how far along the top of that hill is when the road levels out?

A. No.

Q. Then you said Rauser went ahead and the car you were in, that was behind, is that right?

A. Yes.

Q. Did you notice the speed of your car?

A. Yes. I looked once and it showed about 80, 85.

Q. Where was that with respect to the hill? Before or after you went over the hill?

A. I think it was going up it.

Q. After that did the speed of your car increase or decrease or remain constant?

A. I know we kept on climbing up the hill kind of gaining speed and on top of the hill saw Rauser was pretty well ahead and we saw him pull over to the side, then Larry Gehring pulled his foot off the gas.

Q. Did your speed increase at any time after that?

A. No.

Q. Would it be fair to say it was either slowing down or remaining constant from that time on?

A. When he slowed down, it remained constant after that, you know.

Q. About how far ahead was the Rauser car, if you can tell?

A. It is pretty hard to tell.

Q. It was dark?

A. Yes.

Q. Was there a time when you couldn't see the Rauser car because it was ahead of you on the hill?

A. Yes, the Rauser car was over the hill and we were going up it.

Q. Then when you got at or near the crest of the hill then could you see the Rauser car?

A. Yes.

Q. What did you see then as you came over the hill?

A. Well, we seen Rauser pull over to the side onto a gravel road and make a U-turn.

Q. What lights if any did you see on his car at that time?

A. The brake lights we saw when he slowed down.

Q. Then what did the driver of the car do?

A. Larry put his foot off the gas to see if Rauser would pull out in front or something like that.

Q. And what next did you notice about the Rauser car up ahead?

A. We seen it stop so Larry he kept going. I don't think he stepped on it or nothing; he just kept on going, and when he pulled out Larry slammed on the brakes; he tried going around it on the left side.

Q. What was it you saw that indicated that the car was—the Rauser car was turned?

A. Nothing that I can say.

Q. You do recall the brakes on the car you were in?

A. Yes.

Q. At that time where was the Rauser car?

A. When Larry put on the brakes? The Rauser car started going across.

Q. Could you estimate the speed of your car at the time the brakes were applied?

A. 60, 65, 70.

He said he did not remember for sure whether Eldon said or did anything about the driving before the collision. He testified that after the race was in progress, Eldon did not object. When asked if he remembered when Ehrman put his foot on the accelerator, he answered: "He probably did, but I don't remember nothing like that."

Llewellyn Rauser, the driver of the other vehicle involved in the accident, testified concerning a conversation which took place while the two cars were parked on the south side of Highway 52 at the intersection of Highway 14, as follows:

Q. And the subject of racing came up, you said?

A. Yes.

Q. Now, did he say anything about racing to you?

A. Well, he said it was "Okay," as long as the rest of us agreed to it.

Q. And everyone agreed to it, did they?

A. I don't know about the boys in the back seat but it was okay with Larry Gehring and Eldon.

Q. It was all right with the plaintiff Larry Gehring—the defendant Larry Gehring and the plaintiff Eldon Ehrman to race?

A. Yes.

It should be noted that Llewellyn also suffered a loss of memory. His testimony concerning what he remembers of the race was as follows:

Q. And then what happened?

A. Somebody said "Go" and we took off.

Q. Which car did somebody say "Go" in?

A. I believe it is in ours. I believe Clarence said it.

Q. What was the position of your car and the position of the Ehrman car at that time?

A. Our car was on the left hand side of the road and their car was on the right hand side.

Q. On Highway what?

A. Highway 14.

Q. What direction were you traveling?

A. South.

Q. After someone said "Go," what happened?

A. We both took off side by side and I pulled out in front of them and passed them.

Q. How far were you side by side?

A. It wasn't too great of a distance.

Q. After you pulled out in front of him, what happened and where did you go?

A. I remember going south. I went over the hill and come to the mile south, I started slowing up, and I seen the tail light—their headlights in my mirror. That is the last I remember.

Q. What distance were they away from your car at the time you saw the headlights, if you know?

A. I think about a quarter of a mile.

Larry Grossman, a passenger in the left rear of the Ehrman car, testified that he didn't think they talked about anything while the two cars were stopped at the intersection of Highways 52 and 14, but said that the two cars raced side by side, he supposed, about up to the hill. He said he looked at the speedometer and it was about 80 when they were about in the. middle of the hill. He further testified as follows:

Q. Then what happened?

A. When we got up the hill we started slowing down.

Q. Started slowing down?

A. Yes.

Q. Was there some talk back and forth at that time?

A. No.

Q. Did you speed up after that?

A. No.

Q. Did you hear the plaintiff here, Eldon Ehrman, say anything when you started slowing down?

A. He said, "Step on it."

Q. You know him as the Eldon Ehrman, the plaintiff, sitting there (indicating), and as the fellow sitting in the right hand front seat, right?

A. Yes.

Q. And he is the one that said, "Step on it," is that correct?

A. Yes.

Q. What happened then?

A. I don't know. Larry didn't step on it.

Q. He didn't?

A. No.

Q. Did you go up over this hill?

A. Yes.

Q. What happened after you came up over the hill?

A. Well, we seen Llewellyn start to turn in to make a "U" turn.

Q. Why do you say you saw Llewellyn?

A. I saw his brake lights go on.

Q. You saw his brake lights go on?

A. Yes.

Q. Were all of you looking out the front window that you observed?

A. I think so.

Q. You were sitting in the back seat, it that right?

A. Yes.

Q. And from your vantage point, or your viewpoint in the back seat, you could see the brake lights go on?

A. Yes.

Q. On the Rauser car?

A. Yes.

Q. How far back were you at that time? Just up over the hill?

A. Yes.

Q. And you continued driving in a southerly direction? Going south?

A. Yes.

Q. What happened then?

A. Well, we kept on going about 55 or 60, and then we seen Llewellyn started turning out.

Q. How far back were you at that time?

A. About 100 yards, 200, something like that.

Q. 100 or 200 yards back when you saw the Rauser car start to turn around?

A. Yes.

Q. Then what happened?

A. Well, slammed on our brakes.

Q. And the accident occurred?

A. Yes.

He further testified, in response to the question whether there was any objection on the part of anyone in the car about racing, that he did not recall any such objection.

Concerning Larry's driving just preceding the collision, he testified as follows:

Q. Would it be safe to say that as soon as he saw the car pull out he put on the brakes?

A. Not right away; he didn't think he was going to come out; he stepped on a little bit to get past him and when he seen he was going to pull out then he slammed his brakes.

Q. Did he turn to his left any?

A. I think he started when he pushed on his brakes.

On cross-examination he testified as follows:

Q. You are not quite sure what it was he said, are you?

A. No.

Q. Could it have been, "Step on the brake?"

A. I don't think so. It could have.

Q. Could it have been somebody else who said that instead of Eldon?

A. I don't think so.

Q. As a matter of fact, though, you have said you thought it was Eldon that said that?

A. Yes.

Q. You are not absolutely positive, are you?

A. Not positive, no.

Q. At any rate, Gehring didn't step on it, did he?

A. No.

Q. He didn't step on either the gas pedal or the brake, did he, at that point?

A. No.

Duane Sauvageau, who was a passenger in the right rear of the Ehrman vehicle, testified that he heard something about racing that evening but gave no details relative thereto. He testified that he looked at the speedometer in the Ehrman car after the Rauser car had gone over the hill, and that they were then going about 80 miles per hour; that Larry slowed down some and then stepped on the gas again while they were going up the hill; and that he heard Eldon Ehrman say, "Step on it."

His testimony concerning his observations of Eldon were as follows:

Q. Tell me what you observed after this statement was made with regard to the physical acts of Eldon Ehrman.

A. He put his—he put Larry Gehring's foot on the gas.

Q. You saw this?

A. Yes.

Q. The plaintiff took his foot off the floorboard and jammed it on top of the foot of Larry Gehring?

A. Yes.

Q. Did the car increase in speed?

A. It didn't seem like it.

On cross-examination he testified as follows:

Q. As a matter of fact, what you told me a week ago was that you heard somebody say, "Get your foot off the gas." Isn't that what you told me a week ago?

A. I don't remember.

Q. You can't remember what you told me a week ago?

A. Something like that.

Q. Isn't that the only thing you told me a week ago about the gas?

A. I don't know.

On re-cross-examination he testified as follows:

Q. Did you hear any conversation saying it was a dead car?

A. I think I heard somebody say that.

Q. Do you know who said it?

A. Not for sure. I think it was Eldon, but I am not too sure.

Q. When was this? When did this statement take place?

A. Before we got to the top of the hill—at the bottom—at the top of the hill.

Clarence Degenstein, the passenger in the Rauser vehicle, testified that he heard something about racing while the Rauser vehicle was stopped beside the Ehrman vehicle at the intersection of Highways 52 and 14, but that he was not sure who talked about racing. Concerning the race he testified as follows:

Q. What happened when you started to race?

A. Well, Llewellyn he overtook Larry Gehring when we went up over the hill; he cut in front of Larry Gehring and we went up over the hill. We were going 70, 75, 80. Then Llewellyn started to turn off on this approach.

Q. Could you see the Ehrman car coming behind?

A. I just seen the shadow of the lights come across the hill.

Q. Then the accident occurred?

A. Yes.

Larry Gehring, the driver of the Ehrman vehicle said that he recalled no conversation about racing at the time they were stopped at the intersection of Highways 52 and 14, but that after they crossed the intersection, they in effect started to race. He stated that when they got to the bottom of the hill before they started up the hill, he was driving 65. He testified as follows concerning what happened when he got to the top of the hill:

Q. Well, now, what happened when you got on top of the hill?

A. I saw his brake lights; I saw he was pulling into that approach on that section line, and then I took my foot off the gas, and then Eldon pushed it back down, and then when I was about 150 feet away he pulled out in front of me.

Q. Who pulled out in front of you?

A. The Rauser vehicle.

Q. From the approach?

A. Yes.

Q. What did you do then?

A. I swerved to avoid him and jammed on the brakes.

Q. About how fast were you going, if you know, when he pulled out in front of you?

A. I don't really know, about 60.

His testimony concerning Eldon's action in depressing the accelerator was as follows:

Q. Where were you when Eldon put his foot on your foot and depressed the accelerator? What part of the highway were you in?

A. Just over the hill. Just came over the hill.

Q. Did your car speed up?

A. Just slightly.

Q. Did he then remove his foot from the accelerator?

A. Yes.

Q. In the sequence of time how soon after he did that did the accident happen?

A. Oh, about five seconds. It wasn't very long.

Q. It was a short interval of time then?

A. Yes.

He said that when he approached the Rauser car, it was facing south, that it pulled out towards the east, and that the Ehrman car was in the center of the highway when it hit the Rauser car.

He testified that no one objected to his driving as he drove south, and that the race was over before the car went over the hill; that Eldon kept his foot on the gas pedal about three seconds; and that he didn't recall whether he had told the Highway Patrol officer, when interviewed a few days after the accident, about Eldon's depressing of the accelerator.

Allan Lemer, another passenger in the back seat of the Ehrman vehicle, said he thought there was a conversation as to racing, but he didn't know where it took place. He said the Ehrman vehicle was going "about 55 to 60; maybe 55" at the time the Rauser vehicle pulled out on the highway.

Leroy Fred, State Highway Patrolman, who investigated this accident, testified that the crest of the hill spoken of in the testimony is six-tenths of a mile south of Anamoose and that there is a flat, unobstructed stretch of highway for the next four-tenths of a mile to the intersection where the accident occurred. In response to questioning concerning the visibility, condition of the road, etc., he testified as follows:

Q. So that approximately the distance from the crest of the hill to the intersection where the accident took place is about .4 of a mile?

A. Yes. This would be the perception distance.

Q. What is meant by "perception distance"?

A. The very definite sight picture and pattern that any alert driver should be able to see a danger immediately before him.

Q. Is there any obstruction at all in that .4 of a mile to the view?

A. No.

Q. What is the nature of the road, Highway 14, south of Anamoose?

A. This is a blacktopped State highway; it has a center-line stripping on it.

Q. What is the approximate width of the road?

THE WITNESS: May I refer to my notes, you Honor?

THE COURT: Yes.

A. Approximately 30 feet.

Q. What were the weather conditions the night of December 1, 1962?

A. This was a clear evening.

Q. What was the condition of that road that night?

A. The road was in good driving condition. There were no road defects that I could find.

Q. What was the speed limit on that road at that time?

A. Fifty-five miles per hour.

Q. Is that the night speed?

A. That is the night speed limit.

He testified that the Rauser vehicle left no skid marks but that the Ehrman vehicle laid down skid marks for 57 feet, and that from the beginning of the skid marks

to the resting place of the cars was approximately 131 feet; that the skid mark of 57 feet began 2 feet to the right of the center line of Highway 14 in the southbound lane of traffic; and that he identified this skid mark as the left wheels of the Ehrman vehicle. The diagram which he prepared and which was received in evidence indicated that the 57 feet of skid marks crossed the center line of Highway 14 just short of its intersection with the township road; that it extended on through the intersection on the east side of the center line; and that another 17 feet of skid marks, representing the right wheels of the Ehrman vehicle, started south of the intersection about on the center line and extended on the east side of the center line.

He stated that the damage to the vehicles indicated speed.

He testified that he interviewed each of the boys involved in the accident except for Larry Grossman within a few days of the accident, and that in the interview he asked each of them what was said and what was done during the one mile between the intersection of Highways 52 and 14 and the place were the accident occurred.

In regard to the interview with Llewellyn Rauser he testified in part as follows:

Q. All right. Will you tell me whether or not at that time Llewellyn Rauser told you that Eldon Ehrman had said that racing was okay as long as the rest of them agreed to it? Did he make that statement to you or anything similar to it?

A. No, not that I recall.

Q. Did Llewellyn Rauser tell you that he and the other driver had agreed to race up to 60 miles an hour?

A. There was mention of racing up to that speed, yes.

Q. Did he tell you, that is, did Llewellyn Rauser tell you the last he remembered was slowing up and seeing the tail lights of the other car in the mirror?

A. (Pause.) He did not say that was the last he remembered. He remembered starting to make the turn and seeing the headlights bear down on him.

Q. Did he, in fact, tell you that he thought he had time to make the turn?

A. Yes, he did.

Q. Did he tell you that he didn't remember anything about stopping or turning?

A. No, he did not.

In respect to his interview with Duane Sauvageau he testified as follows:

Q. At that time and place I will ask you whether Duane Sauvageau told you that he heard someone, I believe Eldon Ehrman, say, "Step on it"?

A. No, not that I recall.

Q. At that time and place I will ask you whether Duane Sauvageau told you that Eldon Ehrman put his foot on the gas pedal?

A. No, he did not.

Q. I will ask you whether at that time and place Duane Sauvageau told you he thought Eldon Ehrman said, "It was a dead car," or words to that effect?

A. No, he did not.

As for his interview with Larry Gehring, he testified as follows:

Q. And in your conversation with Larry Gehring, that was at the same time and place as the conversation with the Rauser boy, isn't that right?

A. Yes.

Q. All right. I will ask you at that time and place if Larry told you "Eldon pushed down the gas pedal"?

A. No, he did not.

In reviewing the aforesaid testimony and other testimony and evidence

submitted in the case but not set forth herein in light of the rules stated earlier, we conclude that the jury could have found that the defendant Larry Gehring negligently drove the Ehrman car at a speed in excess of the legal limit and without having it under control, and that his negligence was a proximate cause of the collision between the two cars which resulted in the personal injury to the cross-claimant. We believe also that the jury could have found that the defendant Larry Gehring failed to sustain the burden of proof by a preponderance of credible evidence as to contributory negligence, assumption of the risk, and the existence of an emergency which would have justified the exercise of less than ordinary care.

■ The jury was not required to accept the testimony of Larry Gehring as to Eldon's act of depressing his foot on the accelerator (although it was not contradicted, Eldon being unable to dispute it because of his lapse of memory), because Larry was an interested party. In the 1965 case of Larson v. Meyer, this court said:

> The trier of the facts is not required to accept the uncontradicted testimony of an uncorroborated interested party, although such testimony is not contradicted by other testimony.

Larson v. Meyer [Syllabus 2], 135 N.W. 2d 145 (N.D.1965).

In the instant case only one, Duane Sauvageau, who rode with four other boys in the rear of the Ehrman vehicle, testified as did the defendant Larry Gehring, that Eldon stepped on Larry's foot while it was on the accelerator; but it is significant that Larry stated that the car speeded up "just slightly" and Duane stated that the car did not seem to increase in speed as a result thereof, and that both testified that this act occurred after Larry had reduced speed and accordingly let up on the accelerator. As the credibility of the witnesses and the weight of the testimony is a matter for the jury to determine, we cannot say as a matter of law that Larry Ehrman's testimony was corroborated by credible testimony.

■ In light of the fact that none of the witnesses informed the highway patrolman of Eldon's act of depressing the accelerator or his statement to the effect that the car was dead and that Larry should step on it, at the time the patrolman made his investigation within a few days of the accident when the details should have been vividly in the minds of all of the witnesses, the jury could have reasonably and logically concluded that this part of the testimony was a fabrication. Thus, they could have disregarded it.

There were nine boys involved in the accident, one of whom, Henry Bichler, was not called as a witness. Eldon Ehrman testified that after he came out of the drug store and went to Llewellyn Rauser's car, Llewellyn asked him if he could race the Ehrman car, and he said no, he didn't want to. He said that this was the entire conversation about racing as far as he knew. He suffered a lapse of memory and remembered nothing that happened from the time the five boys jumped in the back seat of the car at the old school gym until after the accident. Larry Gehring testified that he did not recall any conversation about racing at the time the cars were stopped at the intersection of Highways 14 and 52. Llewellyn Rauser said that when they were on the south side of Highway 52 he had occasion to talk to the boys in the other car, that Eldon was sitting on the right-hand side of the driver of his father's car, that the subject of racing came up, and that Eldon "said it was 'Okay' as long as the rest of us agreed to it." Larry Grossman testified that when the two cars were stopped at the intersection of Highways 52 and 14, he didn't think they talked about anything and that Eldon was sitting in the right-hand front seat. Duane Sauvageau was asked, "Did you hear anything about racing

that night?" and answered, "Yes." Allan Lemer testified that he thought there was conversation in regard to racing but did not remember what was said nor where the conversation took place. Clarence Degenstein testified that there was a conversation between the two cars at a time when the car in which he was riding was stopped beside the Ehrman car, and, on being asked if he remembered what was said, replied, "Something about racing." He said he was not sure who said it. He testified that Eldon was sitting beside Larry Gehring.

■ In light of this varied and conflicting testimony, the jury could reasonably have believed that there was no conversation in which Eldon agreed to race; that the race, when proposed by others, was vetoed by Eldon; that the race which did take place was on impulse, participated in by the drivers and encouraged by some others but not necessarily by Eldon; and that the accident occurred after the race was over, while Larry was indisputedly in complete control of the car and thus wholly responsibile for any negligent act he committed which proximately caused the collision from which Eldon suffered his injuries. There is no evidence indicating that any of the persons involved in the accident raced earlier in the evening, although there was considerable driving done by various members of the group.

Eldon therefore could not be expected to anticipate that Larry would race, especially when he (Eldon) had vetoed racing earlier in the evening.

■ As the race lasted only four-tenths of a mile, there was little opportunity to stop the race or for Eldon to reassert control over the vehicle by re-establishing himself as the driver. Had he demanded that the car be stopped for this purpose prior to reaching the intersection of the gravel road with Highway 14, it would have been necessary to stop the car on the shoulder of the road in the nighttime, which is also hazardous, or it would have required a finding of an approach. The jury could reasonably have concluded that the collision occurred before Eldon had any real opportunity to re-establish himself as the driver. If there was little opportunity for him to re-establish himself as driver, it is of little importance that he did not orally assert his right to do so.

In any case, on the state of this record we do not believe that we could say as a matter of law that Larry assumed the risk, or that he was negligent and that his negligence proximately contributed to the accident, or that an emergency existed so that the defendant was required to exercise less than ordinary care.

■ In Bauer v. Kruger, supra, 114 N.W.2d 553 (N.D.1962), we quoted with approval from Corpus Juris Secundum as follows:

"Where a traveler upon or across a highway is confronted by a sudden emergency created by the negligence of another and not by his own fault, he is not held to the same degree of care and prudence as is ordinarily demanded of a person who has time for deliberation and the full exercise of his judgment, and he is not guilty of contributory negligence if he acts as an ordinarily prudent person would act under like circumstances."

Bauer v. Kruger, supra, at 557, quoting 61 C.J.S. Motor Vehicles § 460 (1949).

It is our view that the emergency which was created in the instant case was created by the concurring faults or negligence of the drivers of the two vehicles, and, thus, that it was not an emergency "created by the negligence of another and not by his own fault."

For the reasons stated the judgment and order of the trial court are hereby affirmed.

TEIGEN, C. J. and KNUDSON, J., concur.

STRUTZ, J., concurs in the result.

MURRAY, J., not being a member of the Court at the time of submission of this case, did not participate.