Allen FROEMKE, Plaintiff and Respondent,

v.

Elmer HAUFF, Defendant and Appellant,

and

DuWayne Kuehn, Defendant and Respondent.

No. 8295.

Supreme Court of North Dakota.

Nov. 15, 1966.

Nilles, Oehlert, Hansen, Selbo & Magill, Fargo, and Holand & Stetson, Lisbon, for plaintiff and respondent.

Wattam, Vogel, Vogel, Bright & Peterson, Fargo, for defendant and appellant Elmer Hauff.

Conmy, Conmy, Rosenberg & Lucas, Bismarck, for defendant and respondent DuWayne Kuehn.

ERICKSTAD, Judge (on reassignment).

The defendant Elmer Hauff appeals from the order of the District Court of Sargent County denying his motion for judgment notwithstanding the verdict or in the alternative for a new trial. The appeal arises out of an action brought by the plaintiff, Allen Froemke, against the defendants, Elmer Hauff and DuWayne Kuehn, for damages for injuries he sustained as the result of an automobile accident. The jury brought in a verdict of dismissal as to the defendant DuWayne Kuehn and a verdict in the sum of $28,810 with interest thereon for the plaintiff and against the defendant Elmer Hauff. Judgment was entered, based on this verdict, in the sum of $31,835.20, including interest and costs. No appeal has been taken from the judgment.

In determining the sufficiency of the evidence to support the verdict this court must view the evidence in the light most favorable to the verdict. Grenz v. Werre, 129 N.W.2d 681, 685 (N.D.1964).

Reviewing the evidence in that light, the jury could reasonably have found the evidence to be as follows:

The plaintiff, Allen Froemke, 37 years old at the time of the accident, was married and lived with his wife and their eight children on a farm near Lisbon. He farmed one quarter-section of land which he owned and one quarter-section of land which he rented. In addition to farming, he engaged in the business of moving buildings. On March 11, 1963, the date of the accident, he drove his 1956 model Volkswagen to the home of his friend Elmer Hauff, who at that time was 27 years old and lived at Forman. Mr. Hauff had worked for the railroad but on that date was on leave from the railroad and was working for Minnesota Valley Breeders as an artificial inseminator of cattle. Mr.

Froemke and Mr. Hauff had together done some house moving and contemplated going into the house moving business as partners. Mr. Hauff had, not long before, purchased a truck for this purpose and had placed its title in both their names.

On the morning of that day they planned to look at some house moving prospects and to talk to a Mr. George Schlader about the purchase of some house moving equipment. Together in Mr. Froemke's Volkswagen they left Forman at about 10:00 o'clock in the morning, with Mr. Froemke driving. They first drove to Oakes and then to Glover. While at Glover they talked to Mr. Schlader about buying some of his house moving equipment. On leaving Glover Mr. Hauff started to drive the Volkswagen and drove it to Ludden, where they looked at a prospective house moving job, then to Oakes, and back to Forman.

When they arrived at Forman they learned that three farmers had called for insemination business. As neither of Mr. Hauff's cars were at home, with Mr. Froemke's apparent approval Mr. Hauff removed the right front seat of the Volkswagen and there placed his insemination equipment, including his refrigeration tank in which the semen was kept. As the parties intended to look at another house moving prospect near Rutland, between the second and third insemination calls if time permitted, Mr. Froemke rode along in the rear seat of the Volkswagen while Mr. Hauff drove. He first drove to the Carl Kirmes farm, about 8 miles north and 2 miles east of Forman. Mr. Froemke stayed in the car while Mr. Hauff serviced the first call. Mr. Hauff then drove the Volkswagen to the Milton Hogness farm further east. Mr. Froemke again stayed in the car while Mr. Hauff serviced the second call. When the second call was completed, Mr. Hauff again drove the Volkswagen; he had driven in a westerly direction only two or three miles when the accident occurred.

The prospective building moving project was on the Grant Gulleson farm near Rutland. This farm was on the route to the Justinson farm, which was to have been the third insemination call serviced that day.

The accident occurred about 5:10 p. m. at an intersection of two gravel roads 4 miles east and 2 miles south of Milnor, when a 1954 Ford automobile driven by the defendant DuWayne Kuehn, proceeding in a southerly direction, collided with the 1956 Volkswagen driven by Elmer Hauff, which was proceeding in a westerly direction. At the time of the collision the plaintiff, Allen Froemke, was lying asleep in the back seat of the Volkswagen, with his head toward the side which received the brunt of the impact. Following the collision the Volkswagen and the Ford both ended up in the ditch to the southwest of the intersection, the Volkswagen coming to rest more toward the west and pointing in that direction, and the Ford coming to rest to the south, pointing in a southeasterly direction. The refrigeration or nitrogen tank was thrown from the Volkswagen, and so was Mr. Hauff. Mr. Froemke remained in the back of the Volkswagen. He was later removed in an unconscious state and transported by ambulance to the hospital at Lisbon.

The testimony concerning the speed of the vehicles and the conduct of the drivers is to a large extent in conflict. That being the case, whether the defendant Elmer Hauff was negligent or grossly negligent and whether his negligence was the proximate cause of the accident and the plaintiff's resulting injuries were questions of fact for the jury to determine. It is only when the evidence is such that reasonable men can draw but one conclusion therefrom that the issues of negligence and proximate cause become questions of law for the court to determine. Degenstein v. Ehrman, 145 N.W.2d 493 (N.D.1966). The evidence was not such that reasonable men could draw but one

conclusion therefrom; thus, those issues were for the jury to determine.

We are also convinced that there is substantial evidence to support the verdict; therefore, the trial court did not abuse its discretion in denying the motion for new trial. See Fox v. Bellon, 136 N.W.2d 134, 138 (N.D.1965).

According to the defendant DuWayne Kuehn, a 17-year-old student at Milnor High School at the time of the accident, he was in the process of driving his brother's car home from Milnor when the accident occurred. He testified that he was traveling about 50 to 55 miles per hour; that about 120 feet north of the east-west road to the east of the north-south road there is a shelter belt that extends in an east-west direction; that after he had passed the shelter belt and was about 110 to 115 feet north of the center of the intersection he looked to the east and saw the Volkswagen when it was about 180 feet east of the intersection proceeding in a westerly direction; that when he first saw the Volkswagen it was traveling about 60 to 65 miles per hour; that on seeing the Volkswagen approaching he immediately depressed the brake pedal and slowed, so that he believes he was traveling about 25 to 30 miles per hour at the time of the collision; that the Volkswagen did not reduce its speed nor did its driver appear to be cognizant of the impending collision; that as a result the Ford collided with the Volkswagen as the latter was leaving the intersection and proceeding in a westerly direction, striking it on the right side just back of the door, it being a 2-door vehicle.

An effort was made by counsel for defendant Hauff in cross-examination to impeach the testimony of Mr. Kuehn by reference to statements made previously by him in a discovery deposition. Whether Mr. Kuehn was impeached was a matter for the jury to determine, and the jury apparently determined this question in Mr. Kuehn's favor, as they brought in a verdict of dismissal of the action against him.

Mr. Hauff testified that as he approached the intersection he looked to the right (north) on a number of occasions, the last being when his vehicle was about 100 feet east of where the east-west road intersects the north-south road, and that at that time he saw no vehicle approaching. He acknowledged that he did not look back to the north thereafter, and thus that he did not at any time see the Kuehn vehicle approaching. He stated, however, that because of the shelter belt south of the east-west road and east of the north-south road he slowed his vehicle to a speed of 30 to 35 miles per hour as he entered the intersection.

With this background we shall now attempt to consider the arguments of the appellant, Elmer Hauff, in the order set forth in his brief. Incidentally, it should be noted that the appellant asserts 21 specifications of error, which occupy 58 pages of his brief. We shall discuss these specifications only as they have been supported by arguments in his brief.

He first asserts that specifications of error 1, 2, 3, 4, and 5 set forth the facts as recorded in the transcript and testified to at the trial with reference to exhibits admitted over his objections. It is his contention that there was not proper foundation for the admission of certain exhibits and that he was thereby prejudiced on the receipt of them. What are these exhibits?

It appears to us that the first exhibit complained of is referred to in specification of error 3 as Plaintiff's Exhibit 1. This exhibit is a plat of the intersection known as the Mund farm intersection because the Mund farm buildings and shelter belt lie adjacent to the intersection on the south-east. This plat was drawn to scale, 1 inch on the plat being equal to 10 feet at the intersection.

Before receipt of the exhibit in evidence the State Highway Patrolman testified that

117 feet north of this intersection there is a shelter belt which runs parallel to the east-west road and that the closest point of the shelter belt to the east side of the north-south road is 36 feet. He located these trees on the plat with black curved marks, the area being in the shape of a parallelogram. He represented by the same type of marks the trees southeast of the intersection. He testified that it was approximately 10 feet from the south edge of the east-west road to the base of the trees in the southeast area and that the trees were approximately 12 feet from the east edge of the north-south road on the south side of the intersection.

It was argued by Mr. Hauff that the location of each tree was not determined, and that therefore the black curved marks were misleading. The trial court received the exhibit in evidence, however, being careful to point out that the record should show that the only purpose of the marks representing trees on the exhibit was to show the distance of the trees from the road and an outline of the area covered by them. Mr. Hauff contends that the receipt of this exhibit constitutes prejudicial error, especially in light of the following instruction given by the court:

> The laws of the State of North Dakota provide: "It presumably shall be lawful for the driver of a vehicle to drive the same at a speed not exceeding twenty miles an hour when approaching within fifty feet and in traversing an intersection of highways when the driver's view is obstructed. A driver's view shall be deemed to be obstructed when at any time during the last fifty feet of his approach to such intersection, he does not have a clear and uninterrupted view of such intersection and of the traffic upon all of the highways entering such intersection for a distance of two hundred feet from such intersection."

We do not agree with Mr. Hauff's view. As the marks representing the tree area were clearly explained to the jury, we do not believe that the jury could have been misled by them. Thus, there was no error in the receipt of this exhibit in evidence.

■ Specification of error 4 asserts that it was prejudicial error for the court to receive in evidence over the defendant's objections Plaintiff's Exhibits 4, 5, 6, 7, and 8, consisting of photographs of the area which were taken two years after the accident. These photographs were taken by Mr. Dale Thomte of Lisbon on March 21, 1965, from an altitude of 300 to 600 feet.

Deputy Sheriff Harris Mund, who investigated the accident, testified that the trees off the southeast corner of the intersection were 35 to 50 feet high; that the night before he testified in court he tried to reach around a big tree just off the southeast corner and was unable to do so; and that when he measured it, it was 6 feet in diameter. He testified that all five exhibits fairly and accurately portrayed the intersection, the Mund buildings, the trees, and the roads at the time of the trial, as well as at the time the accident occurred.

■ We have examined the photographs and noted the size of the trees and are of the opinion that two years' growth could not have appreciably changed the appearance of the trees so as to have misled the jury. The statute from which the instruction was taken states that a driver's view shall be deemed obstructed when at any time during the last 50 feet of his approach to an intersection he does not have a clear and uninterrupted view of the intersection and of the traffic upon all of the highways entering such intersection for a distance of 200 feet from such intersection. § 39–09–02(3), N.D.C.C. A partial obstruction is an interruption of the view and requires the reduced speed.

■ The defendant Hauff admitted that his view was partially obstructed by the trees at the time of the accident. If his view was partially obstructed, it follows that he did not have a clear and uninterrupt-

ed view within the meaning of the statute, whether or not the underbrush or trees had grown in the interim between the accident and the trial. As pointed out in 3 Jones, Evidence § 629 (5th ed. 1958): "The question of the sufficiency of foundation * * of a photograph is a matter within the discretion of the trial judge."

This work further states:

§ 630.—Miscellaneous Considerations * * * [T]he fact that the photographs were taken at a time remote from the transaction in question does not render them inadmissible if witnesses are able to testify that they are correct representations of the conditions existing at the time in question. The fact that conditions had changed at the time the photograph was taken does not necessarily render it inadmissible but the changes, if material, should be explained in such a way that the jury will not be misled. * * *

It is our view that the changes were adequately explained so that the jury could not have been misled by the admission in evidence of these photographs.

Appellant Hauff's second argument is that it was error for the trial court in the presence of the jury to incorrectly state what a witness had said. The comment objected to occurred during the cross-examination of the defendant Elmer Hauff by counsel for Mr. Kuehn, as follows:

Q. Now, if on the afternoon in question when the accident happened, and during the trip wherein the accident happened, if Mr. Froemke had told you he wanted to drive, and if he had wanted to drive, you would have let him, wouldn't you?

MR. PETERSON: Your Honor, this is calling for a conclusion; I object on the grounds it's speculative.

THE COURT: Well, I believe he has answered that already. He said that he would have surrendered the car to Mr.

Froemke if he wanted it. I don't see any particular purpose of going over it again, Mr. Conmy, unless you have something in mind.

We do not see how this comment on the part of the court could have been prejudicial to the defendant Hauff in light of Mr. Hauff's later concessions on cross-examination by counsel for Mr. Kuehn, as follows:

Q. Again I will ask you this: You say you were in complete control. Weren't you asked this question and didn't you make this answer:

"Q. And if Froemke had wanted to drive his own car, you couldn't stop him or I don't suppose you could have protested or would have protested?

"A. No."

You made that answer to that question, didn't you?

A. Yes.

Q. So, isn't it true, if your answer to that question was true, that Froemke could have asserted his control of his own car at any time if he had wanted to?

A. If he wanted to, yes.

It should be noted that no objection was made when the comment was made by the judge, and no request was made for a curative instruction to the jury concerning the comment. We believe, therefore, that Mr. Hauff has waived any right to urge this comment as error on appeal. See Kern v. Art Schimkat Construction Co., 125 N. W.2d 149, 154–155 (N.D.1963).

The third argument made by the appellant is that the trial court improperly and prejudicially failed to admit impeaching evidence. This relates to specification of error 12, wherein the appellant stated:

The Court erred in not permitting the defendant, Elmer Hauff, to impeach the testimony of Allen Froemke by introducing defendant, Elmer Hauff's, Exhibit A

and commenting to the jury as to the fact that Exhibit A did not contain impeaching statements made by Allen Froemke, which written statement was, insofar as the plaintiff was concerned, not objected to, but which statement the plaintiff agreed to admit.

It is true that the receipt of this statement into evidence was not objected to by the plaintiff, Allen Froemke; however, it was objected to by the defendant DuWayne Kuehn. Exhibit A consisted of a statement which was taken by one of the attorneys for defendant Hauff at Mr. Froemke's farm while the attorney and Mr. Hauff were seated in the front seat of the attorney's automobile and Mr. Froemke was seated in the back seat. The defendant DuWayne Kuehn was not present at the time the statement was taken. The part of the statement which Mr. Hauff believes to be of impeaching value is the part in which Mr. Froemke said that he was along with Mr. Hauff for the ride.

When this exhibit was offered in evidence, counsel for Mr. Kuehn objected as follows:

MR. CONMY: I do object to the receipt in evidence of this Exhibit A, insofar as Defendant Hauff [Kuehn] is concerned, it is the same exhibit, I submit, as Plaintiff's Exhibit 37, as not binding on him and hearsay insofar as he is concerned; and I believe it is entirely improper insofar as Defendant Kuehn is concerned, and if received I would be forced to make further inquiry into its background.

MR. PETERSON: This is not being offered necessarily for evidentiary purposes but for impeachment purposes, your Honor.

THE COURT: What are you impeaching of Mr. Froemke's?

MR. PETERSON: His statement with reference to the purposes of this trip.

When counsel for the plaintiff stated that the plaintiff had no objection to the statement being received in evidence as long as the facts and circumstances explaining it had been developed, the following colloquy occurred:

THE COURT: (Examining exhibits) Well, I don't see how it is anything but cumulative, Mr. Peterson. It isn't impeachment. The story has been gone over half a dozen times by all of you attorneys; and I fail to see where this is proper impeachment or proper redirect cross examination, if there is such a thing. You called Mr. Froemke and you finished your examination and Mr. Conmy asked him some questions which aren't in dispute so far as I know.

MR. PETERSON: Some questions with reference to the right of control.

THE COURT: Well, he's testified to that.

MR. PETERSON: And the purpose of the trip.

THE COURT: Well, I don't see anything impeaching about the purpose of the trip. He's added to it, is all. He said he had no interest in the insemination, and he was riding along but he also has testified, and so has your client, that they were if time permitted going to examine a house at Rutland for moving and also if time permitted to go back over to Oakes, but what impeaches this—his statement, I can't see that it does, Mr. Peterson. So I am going to sustain the objection. I think it's cumulative and lack of impeachment.

Under the plaintiff's theory of his case, he could have recovered damages from the defendant Elmer Hauff by proving him grossly negligent, even if he were Mr. Hauff's guest, and from the defendant DuWayne Kuehn on proof of ordinary negligence.

Under these circumstances the court was placed in a predicament in which he was compelled to determine whether it was more prejudicial to receive the exhibit than to

keep it out. Exercising his discretion, he made the decision to keep the exhibit out; and under the circumstances, in which the plaintiff acknowledged in the presence of the jury that he had signed such a statement, it was not necessary that the statement be received in evidence to prove that he had done so.

The fourth argument made by the appellant in his brief is that the court erred in giving additional oral instructions to the jury.

In this case the initial instructions given the jury were in writing. After these instructions were given, the attorneys met with the court in his chambers, where the following transpired:

THE COURT: Gentlemen, I am wondering what the situation will be. I understand that perhaps Mr. Conmy wants to return home; I don't know about you, Mr. Hansen, or you, Mr. Peterson, or Mr. Stetson. But what is the situation going to be if the jury returns for further instructions or for any information, are you going to waive that or are you going to have somebody here to represent you, because I couldn't go ahead with anything further without your presence or the waiver of your right to be present.

MR. COMMY: On my part I will waive my right to be present in the event such a thing should develop.

MR. HANSEN: That's true of the plaintiff also, your Honor. Whatever your good judgment dictates, we'll abide by.

MR. PETERSON: I'll abide by that too.

THE COURT: You will also waive your right to be present if further instructions or any questions are asked upon the return of the jury to the jury box, of the Court?

MR. PETERSON: Yes, I will, your Honor.

On the same date that this took place (March 29, 1965) at 10:30 p. m. the jury returned to the court room in charge of the bailiffs, and the following proceedings were had:

THE COURT: Let the record show that all members of the jury are present in the box.

Members of the Jury, I understand that there is some question you wanted to ask the Court and your foreman can state whatever it may be.

THE FOREMAN: Motion was made to the Foreman to ask the Judge in case the jury found for the plaintiff against both defendants, if both defendants would have to be held equally liable.

THE COURT: Yes. You wouldn't double the amount but each are equally liable both collectively and individually for the payment. Do you understand what I mean?

Not wanting to in any way attempt to influence or guide you in the matter but just as an example, say that there was a verdict against two defendants for $1000, just as an example, if $1000 was paid, that, of course, does away with the judgment, but if one couldn't pay and the other could, the one could be made to pay. He might have a claim against the other fellow, but that's none of your business here.

Does that answer your question?

THE FOREMAN: That answers our question.

THE COURT: Very well. You return to your jury room. * * *

The appellant, Mr. Hauff, contends that it was error to give these additional oral instructions, and that the court did not correctly answer the question presented by the jury.

■ Our view of this matter is that although instructions to the jury are by law required to be in writing, all parties waived this requirement as to additional instructions when they agreed that they would abide by whatever the court's good judgment dictated. We also see no error in the oral instruction itself and believe that it fully answered the question posed, as indicated by the foreman's statement, "That answers our question."

■ The appellant, Mr. Hauff, also argues that the court's comments with reference to the sealed verdict constituted prejudicial error. He contends that the comments prejudicially coerced the jurors to say to themselves, "Let's make a decision and get out of here so that we will not inconvenience the court and the personnel."

This complaint relates to the following comments of the court:

[THE COURT] * * * I might ask this, Mr. Foreman. If you're going to take some time so, it's now about twenty-five minutes to eleven, so this thing runs late into the night, I'd rather have you bring in what we call a sealed verdict, that is, a verdict which, after you have arrived at a verdict, it could be signed by the foreman and then sealed in an envelope, and after that was done you could go home, and then I would have you return sometime tomorrow, all of you, and then you could give me the verdict at that time. But if you're not arrived at a verdict, say, in the next forty minutes, will you notify the bailiff, and I'll have you brought in, and I'll try to arrange for such a matter so that everyone isn't kept up a lot of the night or most of the night when they should perhaps be enjoying their sleep.

But, anyway, you return now, and, say, in the next forty minutes if nothing is arrived at we will go along that line.

(Thereupon the jury retired to deliberate further.)

(At 11:10 p. m., March 29, 1965, the Jury returned into Court in charge of the Bailiffs.)

THE COURT: The Clerk will call the roll; answer "present" or "here" as your names are called.

(The jury was polled by the Clerk.)

THE COURT: All present, Mr. Clerk?

THE CLERK: All present.

THE COURT: Members of the Jury, I understand that you have yet not arrived at a verdict, is that true, Mr. Kraig, the foreman?

THE FOREMAN: No, we haven't.

THE COURT: Well, I am going to try to save you gentlemen and the rest of us here as much inconvenience as possible. Therefore I am going to direct that a sealed verdict be brought in. Now, the reason I say this is that some Judges have been known to say to the jurors, "If you haven't arrived at a verdict by 11:00 o'clock or 11:30, or whatever it may be, I will not receive the verdict until 10:00 o'clock tomorrow morning," and that makes you stay in the jury room until that time. Of course, I presume you've read about in the bigger cities where they lock a jury up in a hotel for the night or something, but we just don't have those facilities. And you've got to be together and under the control and supervision of the bailiffs until your verdict is arrived at.

Now, by the sealed verdict I mean simply this: When you have arrived at a verdict, the Foreman will date it and sign it, and he will then take this envelope, which is marked, "Sealed Verdict," put it in the envelope, seal up the envelope, and take it home with him. And so we'll all get enough sleep, we'll return at 2:00 o'clock tomorrow afternoon. You will all have to be here, be in your seats at that time, and

**402**

then the Foreman can hand me the sealed verdict and I'll open it and it will be read. That means that as soon as you have arrived at this verdict and as soon as the Foreman signs it and dates it, you can go to your homes and you won't have to wait around until tomorrow morning. But you will have to be kept together in the jury room under the supervision of the Bailiffs until you have arrived at the verdict, the verdict is dated and sealed, placed in the envelope, sealed by the Foreman, taken with him to his home or place of abode, and then be back here tomorrow afternoon at 2:00 o'clock and then we will receive the verdict.

Very well, then, you may retire to your jury room and I'll hand you this envelope, Mr. Kraig.

The record does not disclose how much longer the jury labored that evening, but it does show that the jury returned at 2:00 p. m. on the next day, at which time the court opened and read the sealed verdict of the jury. The verdict is dated March 30, 1965, whereas the comments complained of were made at 11:10 p. m. on March 29, 1965.

There is nothing in the record to support the appellant's contention that these comments in any way coerced the jury into bringing in a verdict based upon anything other than its individual members' convictions.

The fifth argument made by the appellant is that it was prejudicial error on the part of the trial court to refuse to give defendant Hauff's requested instruction No. 1(a). It is his contention that as a matter of law the plaintiff, Allen Froemke, had the status of a guest in the vehicle which was driven by Elmer Hauff, even though the plaintiff was the owner of the vehicle. The requested instruction was as follows:

You are hereby instructed that as a matter of law Allen Froemke had the

status of a guest in the vehicle being driven by Elmer Hauff.

The appellant contends that the evidence is uncontradicted that the plaintiff, Allen Froemke, had decided to go to sleep lying down in the back seat of his own car and that he did go to sleep there, and that this act on his part evidences clearly that he gave up his right of control. It is the appellant's contention that Mr. Froemke, having given up the right of control, became a guest as a matter of law in his own vehicle. He cites the case of Pearson v. Erb, 82 N.W.2d 818 (N.D.1957), in support of this view.

We believe it is important to point out that *Pearson* was decided by this court as the law that the State of Minnesota would apply in that case, and thus that that decision is not binding on this court as the law of this state. Minnesota, in Weber v. Stokely-Van Camp, Inc., Minn., 144 N.W.2d 540, rejected *Pearson*.

In Degenstein v. Ehrman, 145 N.W.2d 493, this court in Syllabus 1 and 2 said:

1. The status of a host or his bailee is not changed by reason of the fact that he permits his guest to do a part of the driving.

2. Whether a person is a guest within the meaning of the guest act is a question of fact if the evidence as to the nature of the relationship between the parties is in conflict or is susceptible of different constructions, but if the facts from which the question of host-guest relationship arises are not in dispute, it is only the legal effect of the facts which is at issue.

We are also of the opinion that the mere fact that the plaintiff-owner of the vehicle fell asleep in his vehicle while the defendant Elmer Hauff was driving it does not of itself establish as a matter of law that the plaintiff thereby became a guest in his own car or that his status was

thereby changed from that of a host to that of a guest.

In Leonard v. Helms, 269 F.2d 48 (4 Cir. 1959), the United States Court of Appeals held that the mere fact that the plaintiff fell asleep in his own vehicle did not change his status as a matter of law from host to guest.

■ As we said in *Degenstein*, the purpose of the guest statute is "to protect one who, generously, without accruing benefit, has transported another in his vehicle." We believe that it would be contrary to this policy to interpret the statute to include the plaintiff in the instant case.

As the testimony was in conflict as to the plaintiff's purpose in riding along with the defendant Hauff while the defendant conducted his artificial insemination business, the plaintiff contending that he rode along so that Mr. Hauff and he could look at a prospective house moving project near Rutland between the second and third insemination call if time permitted, and the defendant Hauff seemingly taking issue with this contention, there was an issue of fact pertinent to the determination of the status of the plaintiff in his own car for the jury to determine.

■ Argument No. 6 of the appellant, Mr. Hauff, is that it was prejudicial error for the trial court to instruct the jury that there is a presumption of law to the effect that an owner present in his own car has the power to control it and that this presumption can be overcome by a preponderance of the evidence showing that this right has been surrendered. The complained-of instruction reads as follows:

The presumption of law is, in the absence of any evidence to the contrary, that an owner present in his own car has power to control it. However, this presumption may be overcome, if the evidence establishes by a preponderance of the evidence that the owner of the car (in this case the plaintiff) has by word or action, expressly or impliedly, transferred his right of control to the driver (in this case the defendant Elmer Hauff). Where there is evidence of any such words, actions or conduct on the part of the plaintiff, or any other circumstances or evidence bearing on the question as to whether he in fact surrendered his right of control, then this question becomes a factual one for determination by you as the jury.

In Jasper v. Freitag, 145 N.W.2d 879 (N.D.1966), this court said:

We believe that the instruction of the trial court in this case that "there is a presumption, in the absence of any evidence to the contrary, that an owner present in his or her car has the power to control it," was therefore misleading, without a further instruction to the jury that the plaintiff could not be barred from recovery unless the evidence further establishes that she was negligent in failing to control the conduct of the driver under the circumstances in this case.

In that case a husband and wife were proceeding down the highway in the wife's car, the husband driving, when the car collided with the rear end of a transport truck. The wife sued the driver and the owner of the transport for damages she sustained from personal injuries resulting from the collision. The defendants contended that the husband-driver was negligent, and that his negligence was imputable to the plaintiff-wife so as to prevent her from recovering from the defendants. The jury brought in a verdict dismissing the plaintiff's complaint, and on appeal this court held that that instruction, standing alone, constituted prejudicial error.

In the instant case, however, although the instruction was erroneous without the qualifying phrase required in *Jasper*, it was error without prejudice to the appellant, because in the action between the plaintiff-owner and the defendant-driver the important matter to be determined was not whether the owner had the right to control

the conduct of the driver, but whether the owner was negligent in failing to control the conduct of the driver under the circumstances of the case. Under the facts of this case we do not see how the granting of a new trial, with the giving of the proper instruction, could possibly result in a different verdict. There is no showing that the plaintiff-owner had any knowledge that the defendant-driver was a reckless or careless driver, so that he could be held negligent in entrusting his vehicle to the defendant.

The last argument made by the appellant, Mr. Hauff, is as follows:

* * * [W]e believe that the verdict of the jury is way in excess of the injuries sustained by the plaintiff.

▮▮▮▮ In Kuntz v. Stelmachuk, 136 N.W.2d 810 (N.D.1965), this court considered a similar contention. That case involved an action brought by a plaintiff who was a passenger in a taxi owned by one of the defendants for damages for personal injuries suffered in an intersection accident involving the taxi and another vehicle. The jury returned a verdict of approximately $22,000 against the defendants. On a motion for judgment notwithstanding the verdict or in the alternative for a new trial the trial court denied the motion for judgment notwithstanding the verdict but granted a new trial on the issue of damages only unless the plaintiff within 30 days should agree to a reduction of the verdict in the sum of $4,000. On appeal this court affirmed the trial court, saying:

The determination of damages in a personal-injury case, which includes the damages for pain and suffering, never is susceptible of arithmetical calculation. Its ascertainment must, to a large degree, depend upon the common knowledge, good sense, and practical judgment of the jury. Lake v. Neubauer (N.D.), 87 N.W.2d 888. There is no certain or definite rule by which the amount of damages can be measured, and each case must be determined on its own merits.

This determination is in the province of the jury. Before this court will interfere with the verdict on appeal, it must be so excessive or so inadequate as to be without support in the evidence.

* * * * * *

* * * A verdict will not be set aside on the ground that it is excessive, unless the amount of it is so outrageously excessive as to suggest or demonstrate that the jury was influenced by passion or prejudice. Anderson v. Schreiner (N. D.), 94 N.W.2d 294.

Kuntz v. Stelmachuk, supra, 136 N.W.2d at 820.

▮▮▮ Considering the rules applied in Kuntz, we are of the opinion that the evidence justifies the verdict and that it is not excessive.

The transcript of the trial court proceedings in this case covers 716 pages, with a great part being devoted to the medical aspects of the case. The deposition of Dr. Robert R. Ivers, the neurologist who examined the plaintiff, alone covers 118 pages.

We have read and carefully studied this transcript and are of the opinion that there would be very little value in restating the medical evidence in detail in this opinion.

We realize that because a great deal of the evidence relates to brain, nerve, and soft tissue damage, much of the medical evaluation is based upon subjective symptoms of the plaintiff. Such symptoms are always suspect and sometimes can be feigned by a malingerer. Even so, the jury could have found from the evidence that the plaintiff had suffered some painful injuries which produced temporary disabilities and some injuries which produced permanent disabilities of a less painful nature. The trial court has apparently agreed with the verdict in refusing to set it aside or to reduce it.

It is true that Dr. Ivers said that it was difficult to keep Mr. Froemke from em-

bellishing his symptoms. The same specialist, however, stated that Mr. Froemke gives evidence on testing and from history that function of the olfactory nerve has been disturbed, and that this is something that a person cannot pretend or feign; that a second injury is a cerebral contusion or bruising of the brain, with impaired functions since the accident; that a third injury was to the muscles and ligaments of the neck; and that a fourth injury was to the nerves underlying his left collar bone. The foregoing was the finding of Dr. Ivers on Mr. Froemke's first visit to him on July 15, 1963.

On cross-examination the same specialist explained that Mr. Froemke's complaint of low back pain two years after the accident occurred could have been the result of four factors, the first being the existence of a compression fracture of the third dorsal vertebra, the second being the injury to the soft tissue, which caused strain along the entire spine, the third being the instability of the spine, and the fourth being the patient's tenseness.

Dr. Ivers conceded that the patient had a tendency to maximize his symptoms; he nevertheless gave the following answer in response to the request to describe what permanent disability results from a compression fracture:

A. First of all there has been a damage to the structures, the cushion disc in this area was undoubtedly injured along with the injury to the bone. If you are going to injure the bone this much you are going to have to injure the soft tissue which is easily injured. There is degenerative changes going on in this cushion between the bones. And this gradually leads to an arthritic condition developing to this area with increased tendency for pain and discomfort in the area. The disability then would be that from now on the patient will have an increased tendency for pain and discomfort in this area of his back whenever he is doing anything that will put any pressure on the back. For example, lifting or sitting positions or jarring or this type of thing. From now on it might give the patient some discomfort in this area.

Q. Is there a greater likelihood of injuring himself by lifting or doing other things than there was before?

A. That's correct.

Q. It's not an immediate limitation on motion or use, just the increased tendency toward arthritis or to injury?

A. At the present time this patient is limited in carrying out his regular activities because it hurts him.

Q. Well, I am assuming that the pain condition will go away, am I correct, with healing?

A. When you have this degree of injury it may not.

Q. You would call this, then, a significant fracture?

A. Well, I think that any fracture is significant.

MR. CONMY: I have nothing further.

That Mr. Froemke suffered serious injuries is also shown by the fact that on admission to the Lisbon Hospital he was so irrational that he had to be restrained during the first three days of his hospitalization to prevent his removing the tube which had been introduced through his nose and which led to his stomach to relieve gaseous distention and to prevent his interrupting the flow of the fluids which were administered through a tubing connected to a needle inserted in his vein. Dr. A. K. Lewis of Lisbon, who attended the plaintiff immediately following the accident and during his initial hospitalization at Lisbon Hospital, gave his opinion, based upon reasonable medical certainty, that the plaintiff had suffered a compression fracture as a result of the accident.

Not only Mr. Froemke but his wife, his son, and his former employer testified that following the accident he was unable to do much of the work around the farm and in connection with his house moving business which he normally had done before the accident; and that generally his mental processes were much slower and his personality was negatively affected following the accident.

The plaintiff's life expectancy of 33 years was also a significant factor for the jury to consider in arriving at the verdict.

For the reasons stated, we find that the verdict is supported by the evidence and thus is not excessive nor the result of passion or prejudice.

 Many other specifications of error are asserted by the appellant, but as they have not been supported by argument in the brief, they are deemed abandoned. Regent Co-op Equity Exchange v. Johnston's Fuel Liners, Inc., 122 N.W.2d 151 (N.D.1963), Syllabus 4.

The order of the trial court is affirmed.

KNUDSON, J., concurs.

MURRAY, J., participating on the briefs.

TEIGEN, Chief Justice. (Concurring Specially).

I concur in the result reached by the majority in this case. I also concur in all of the syllabi except syllabus 3, which I feel settles an issue not before us in this case. Section 101 of the North Dakota Constitution provides that "every point fairly arising upon the record of the case shall be considered and decided, and the reasons therefor shall be concisely stated * * *." This section was construed in Heald v. Strong, 24 N.D. 120, 138 N.W. 1114, where it was held:

* * * not to require a literal compliance therewith. A point fairly arising upon the record, within the meaning of said section, must be one, the decision of which is necessary to the final determination of the cause, and which is properly presented with a fullness and distinctness, rendering it possible for the court to comprehend it in all its bearings. Such is the well-recognized and settled construction of like constitutional provisions.

This construction was followed In re Novak's Estate, 73 N.D. 41, 11 N.W.2d 64, in which it is stated:

To go farther and rule upon matters raised and argued but not necessary to the determination of the case would, in many instances, amount to a general treatise on law, and be almost tantamount to the giving of an advisory opinion. The former would involve useless cost and we have held repeatedly this court can not render advisory opinions.

It is true the appellants have specified it was error to give an instruction based on Section 39-09-02(3), N.D.C.C However, the specification was not argued in the appellant's brief nor at the oral argument. In fact, the appellant in his argument to this court attempts to substantiate his claim that it was error to admit in evidence certain photographic exhibits on the ground it was prejudicial error to permit the jury to consider them as evidence in view of the provisions of the statute and the instruction which incorporated the provisions of said Section 39-09-02(3), N.D.C.C.

In other words, instead of relying on its specification that it was error to have given the instruction, the appellant accepting the instruction and the statute as being applicable to the case argues that it was error to have admitted the challenged photographic exhibits, and has abandoned the specification that it was error to give the instruction. We have held in a great many cases that assignments of error not argued in the brief or orally are deemed abandoned and not required to be considered on appeal.

Stetson v. Investors Oil, Inc., N.D., 140 N.W.2d 349; Julson v. Loyal Order of Moose, Number 822, N.D., 140 N.W.2d 39; Smith v. Amerada Petroleum Corporation, N.D., 136 N.W.2d 483; Geck v. Wentz, N.D., 133 N.W.2d 849, and many more cases which may be found under ☞107A—Appeal and Error, in West's Digests.

I think that the interpretation placed upon the statute in question in the opinion and syllabus 3 is not a point fairly arising upon the record in this case and is advisory only. Further, that the instruction became the law of the case and is not reviewable as a question before this Court.

STRUTZ, J., concurs.